**Dr. Helene BAKEWELL and Dr. Hebe Mace, on behalf of themselves and others similarly situated, Plaintiffs**

v.

**STEPHEN F. AUSTIN STATE UNIVERSITY, et al., Defendants [1]**

No. 9:91CV179.

United States District Court, E.D. Texas, Lufkin Division.

July 15, 1996.

---

[1]. The following remain as defendants: Stephen F. Austin State University (SFA), the SFA Board of Regents and Dan Angel, in his official capacity as SFA president. *See* Order, entered Nov. 21, 1995 (dismissing Cathy Allen); Order, entered Sept. 13, 1995 (dismissing William R. Johnson and substituting Angel in his place) (dismissing James R. Reese, William Brophy and Heinz Gaylord)

Larry R. Daves, Carol Bertsch (Larry R.
Daves & Assocs.), San Antonio, for plaintiffs.

Robert B. O'Keefe, Lori Bien (Texas Attorney General's Office), Austin, for defendants.

## MEMORANDUM OPINION

HEARTFIELD, District Judge.

1. The court bifurcated this case's trial into liability and relief stages. Order, entered June 19, 1995 (granting motion to bifurcate); *see also* Joint Supplement to Am. Joint Pre–Trial Order at 1–4. It now enters findings of fact and conclusions of law regarding the liability phase.[2] See Fed. R.Civ.P. 52(a). In doing so, it adopts "[a]ny conclusion of law more properly characterized as a finding of fact ... as such" and "[a]ny finding of fact more properly characterized as a conclusion of law ... as such." *LaFleur v. Westridge Consultants, Inc.*, 844 F.Supp. 318, 320 (E.D.Tex.1994).

### PRELIMINARY ISSUE: RELATIONSHIP BETWEEN TITLE VII & TITLE IX

2. This case involves charges of sex discrimination in employment. *See, e.g.*, Am. Joint Final Pre–Trial Order at 2–3.

3. Five of the claims allege a violation of both Title VII of the Civil Rights Act of 1964 (Title VII) and Title IX of the Education Amendments of 1972 (Title IX). See Joint Supplement to Joint Final Pretrial Order at 1–2. Declaratory or injunctive relief is sought as to each of them. *See* Am. Joint Final Pre–Trial Order at 2–3, 11–12. Injunctive relief

4. Title VII prohibits employers from "[failling] or refus[ing] to hire or ... [from] discharg[ing] any individual, or otherwise discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1).

5. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimina-

tion under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). It delineates "program or activity" and "program" as the following:

> [A]ll operations of ... a college, university, or other postsecondary institution, or a public system of higher education ... any part of which is extended Federal financial assistance, except that such term does not include any operation of any entity which is controlled by a religious organization if the application of section 1681 of this title to such operation would not be consistent with the religious tenets of such organization.

*Id.* § 1687. The institution of higher education involved in this case, SFA, apparently comes within this definition. *See* Defs.' Ex. 76A (Stephen F. Austin State University, *University Fact Book* 80 (1989)); Defs.' Ex. 77B (Stephen F. Austin State University, *University Fact Book* 95, 100 (1994)).

6. "[Although] Title VII explicitly covers employment-related discrimination[,] Title IX has also been held to cover such discrimination." *Mabry v. State Bd. of Community Colleges & Occupational Educ.*, 813 F.2d 311, 316 (10th Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987) (citing *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982)).

7. The United States Court of Appeals for the Fifth Circuit (Fifth Circuit) has determined that "Title VII provides the exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions." *Lakoski v. James*, 66 F.3d 751, 753 (5th Cir.1995), *petition for cert. filed*, 64 U.S.L.W. 3625 (U.S. Mar. 8, 1996) (No. 95–1439). It, however, has "limit[ed] [this] holding to individuals seeking money damages under Title IX directly or derivatively through [42 U.S.C.] § 1983 for employment practices for which Title VII provides a remedy" and has "express[ed] no opinion whether Title VII excludes suits seeking only declaratory or injunctive relief." *Id.; see also Marcus v. St. Tammany Parish Sch. Bd.*, No. 95–3140, 1996 WL 304289, at *1 (E.D.La. June 5,

---

2. Because of this focus, no need arises to consider plaintiffs' argument that they should receive

prevailing party status. *See* Pls.' Post Trial Br. at 81–84.

1996) ("Because plaintiffs have additionally asked for injunctive relief under Title IX, *Lakoski* does not mandate dismissal of plaintiffs' Title IX claims.")

8. Defendants now argue that "the Fifth Circuit would likely extend its holding in *Lakoski* if specifically confronted with a case like this one, where only declaratory and injunctive relief under Title IX are at issue." Post Trial Br. of Defs. SFA, et al. at 6. Based upon this proposition, they assert that *Lakoski's* teaching "foreclose[s]" the Title IX claims presented in this suit. Id. at 58 n. 40.

9. Defendants seek to inject a new contested issue of law into this litigation. *See generally* United States District Court for the Eastern District of Texas, Civil Justice Expense and Delay Reduction Plan app. A (1995) [hereinafter Plan]. The court, therefore, must determine the propriety of modifying the amended joint final pre-trial order to include the fresh concern that defendants raise.[3] *See Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1475–76 (3d Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 247 (1988); *Daniels v. Board of Educ. of Ravenna City Sch.*, 805 F.2d 203, 210 (6th Cir.1986).

■ 10. "An issue or theory not even implicitly included in [a] pretrial order is barred unless the order is later amended 'to prevent manifest injustice.'" *Hall v. State Farm Fire & Casualty Co.*, 937 F.2d 210, 212 (5th Cir.1991) (quoting Fed.R.Civ.P. 16(e)); *cf. Trinity Carton Co. v. Falstaff Brewing Corp.*, 767 F.2d 184, 192 n. 13 (5th Cir.1985) ("Each party has an affirmative duty to allege at the pretrial conference all factual and legal bases upon which the party wishes to litigate the case."), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986). In this case, neither the amended joint final pre-trial order nor any of its supplements even insinuate defendants' present contention that *Lakoski* prescribes a finding that Title VII preempts the Title IX claims raised in this case. *See* Am. Joint Final Pre–Trial Order at 2–15; Joint Supplement to Joint Final Pretrial Order at 1–2; Joint Supplement to Am. Joint Pre–Trial Order at 1–4;

Defs. Supplemental Issues of Fact and Law to Joint Pre–Trial Order at 1–2.

■ 11. Defendants may believe that the announcement of *Lakoski* subsequent to this case's trial creates a situation in which inclusion of their argument relating to that decision in the amended joint final pre-trial order must occur to prevent manifest injustice. *Compare* Order, entered Sept. 12, 1995 (approving the amended final joint pre-trial order, all of its supplements and a joint amended certification) *with Lakoski*, 66 F.3d at 751 (entered Oct. 3, 1995). That sequence of events, however, fails to dictate a modification of the amended joint final pre-trial order.

12. Although *Lakoski* represents the Fifth Circuit's first discourse about the relationship between Title VII and Title IX, *see Lakoski*, 66 F.3d at 754, other courts previously have considered that doctrinal issue. *Compare Howard v. Board of Educ. Sycamore Community Unit*, 893 F.Supp. 808, 814–15 (N.D.Ill.1995) *and Wedding v. University of Toledo*, 862 F.Supp. 201 (N.D.Ohio 1994) *and Storey v. Board of Regents of Univ. of Wis. Sys.*, 604 F.Supp. 1200 (W.D.Wis.1985) *with Broussard v. Board of Trustees for State Colleges & Univs.*, 61 Fair Empl. Prac. Cas. (BNA) 710 (E.D.La.1993) *and Paddio v. Board of Trustees*, 61 Fair Empl. Prac. Cas. (BNA) 86 (E.D.La.1993) *and Henschke v. New York Hospital–Cornell Medical Ctr.*, 821 F.Supp. 166, 171–73 (S.D.N.Y.1993). One appeals court, indeed, apparently has settled the question left unanswered by *Lakoski* that defendants now wish the court to address. *See Preston v. Virginia*, 941 F.2d 1207, 1991 WL 156224, at *3 (4th Cir.1991) (claims of employment discrimination brought under both Title VII and Title IX) ("We find that prospective equitable relief is precisely the type of remedy that furthers the goals intended by Title IX and that has been approved by prior decisions.").

13. The contested issue of law that defendants now desire to introduce into this case, consequently, was discoverable prior to trial. Because of this circumstance, the court de-

---

**3.** The court may amend a joint final pretrial order sua sponte. *See Morris v. Homco Int'l, Inc.*, 853 F.2d 337, 343 (5th Cir.1988); *cf.* Plan art. VI, § 10.

clines to incorporate that assertion into the amended joint final pretrial order. *See Canal Ins. Co. v. First Gen. Ins. Co.,* 889 F.2d 604, 609 (5th Cir.1989) (a party "cannot ... claim 'manifest injustice' to modify the order in light of later-discovered but previously discoverable favorable evidence"); *Trinity Carton,* 767 F.2d at 192 n. 13 ("Even though amendment of the pretrial order may be allowed where no surprise or prejudice to the opposing party results, where, as here, the evidence and the issue were known at the time of the original pretrial conference, amendments may generally be properly refused.").

14. The court, therefore, proceeds to consider the merits of each of the Title IX claims presented in this case. Title VII jurisprudence guides this review.[4] *See, e.g., Preston v. Virginia ex rel. New River Community College,* 31 F.3d 203, 206–7 (4th Cir. 1994); *Lipsett v. University of P.R.,* 864 F.2d 881, 896–97 (1st Cir.1988); *Mabry,* 813 F.2d at 316–18.

### OVERVIEW OF SFA

#### Administrative Structure

15. Texas' legislature and governor "vest[ ] legal control [over SFA] in a nine-member Board of Regents which is the final authority in all University affairs except for certain matters, specified by law." Joint Ex. 502.[5]

16. SFA's president is "[t]he chief administrative officer of the University." *Id.* He or she reports to the Board of Regents. *Id.*

17. SFA "is divided into four divisions: academic affairs, administrative and fiscal affairs, university advancement and university affairs. Each division is headed by a vice president who is responsible to the President for the operation of his [or her] division." *Id.*

18. "The Vice President for Academic Affairs is ... responsible for guidance and supervision of the academic affairs of the University." *Id.* His or her duties include making "[r]ecommend[ations] ... [on] merit increases, promotion, termination, and academic tenure for faculty/staff reporting to [him or her]." Joint Ex. 499A (1 Stephen F. Austin State University, *Policy and Procedure Manual* (Organization and Administration (Statements of Unit Functions))).

19. The following eight units comprise SFA's Division of Academic Affairs: College of Applied Arts and Sciences; College of Business; College of Education; College of Fine Arts; College of Forestry; College of Liberal Arts; College of Sciences and Mathematics, and; Graduate School.[6] *See* Joint Ex. 502. A dean oversees each college. *Id.* He or she is "responsible to the Vice President for Academic Affairs for the academic operation of [those] departments under [his or her] ... supervision." *Id.* A dean's duties include making "[r]ecommend[ations concerning] appointment, salary, tenure, promotion and termination of faculty." Joint Ex. 499A (Statements of Unit Functions).

20. A department chair serves as "the chief administrator" for an academic department. Joint Ex. 502. Because of this role, he or she only dedicates part of his or her time to teaching. *See* Joint Ex. 499B (2 Stephen F. Austin State University, *Policy and Procedure Manual* (Personnel Services (Department Administration))).

21. A department chair's responsibilities include making "[r]ecommend[ations concerning] appointment, salary, tenure, promotion and termination of faculty." Joint Ex. 499A (Statements of Unit Functions). He or she also "[p]erforms ... faculty evaluation[s]." *Id.* (same). These assessments focus on the following: teaching, scholarly activity and service. *See* Joint Ex. 499B

---

4. The Fifth Circuit has never rejected this approach. *See Lakoski,* 66 F.3d at 758 n. 5 (discussing *Chance v. Rice Univ.,* 989 F.2d 179, 180 (5th Cir.1993)).

5. Joint exhibit 502 encompasses the twelfth, thirteenth, fourteenth and fifteenth editions of SFA's *Faculty Handbook.* Unless noted otherwise, a citation to this exhibit refers to all of these.

6. Prior to 1992, SFA's colleges were known as the schools. *Compare* Joint Ex. 502 (Stephen F. Austin State University, *Faculty Handbook Number 13* 1–1 (1990)) *with id.* (Stephen F. Austin State University, *Faculty Handbook Number 14* 1–1 (1992)).

(Personnel Services (Evaluation, Merit Pay, Promotion and Tenure)).

22. Non-tenured faculty members receive evaluation annually. *Id.* (same). "[A]ny faculty member applying or being nominated for merit pay ..., promotion, and/or tenure ... [must] be evaluated in the year of the application/nomination." *Id.* (same).

23. The faculty evaluation process entails the following:

[T]he faculty member ... present[s] to his/her academic departmental[ ] chairman[ ] a completed "Annual Report on Teaching, Scholarly/Creative Activities, and Service" report of his/her activities during the preceding year and any other pertinent information that may be requested. The faculty member then ... [is] interviewed by his/her departmental chairman[ ]. Following the interview, the chairman[ ] ... meet[s] with the ... dean to review the report and the information obtained in the interview, and the two ... submit an 'Administrative Evaluation' form to the Vice President for Academic Affairs for recommendation, if appropriate, to the President of the University.

*Id.* (same).

### Tenure Policy

24. "Tenure means entitlement of a faculty member to continue his/her academic position unless dismissed for good cause." *Id.* (Personnel Services (Tenure (footnote omitted))); *see also* Joint Ex. 502.

25. At SFA, the positions of instructor, assistant professor, associate professor and professor "are used for full-time appointments for a full academic year and are the *only* ones creditable toward tenure." Joint Ex. 499B (Personnel Services (Academic Appointment Titles)). Instructor is the lowest of these academic ranks, while professor is the highest. *See id.* (same)

26. SFA's tenure policy states the following:

With the exception of special appointments clearly limited to a brief association with the University and reappointments of retired faculty members on special conditions, all full-time appointments to the

rank of instructor or a professorial rank are two kinds: probationary or tenured.

Appointments with tenure require that prior to the appointment, the appointee complete the procedure for acquiring tenure at this institution.

Probationary appointments may be for one year, or for other legally stated periods, subject to renewal. Beginning with full-time appointment to the rank of instructor or a professorial rank, the probationary period of a faculty member shall not exceed seven years at this institution, including within this period credit granted for appropriate full-time service in all institutions of higher education. This appointment is subject to the provision that when, after a term of probationary service of more than three years in one or more institutions of higher education, it may be agreed in writing that his/her appointment at [SFA] is for a probationary period of not more than four years (even though thereby the person's total probationary period in the academic profession is extended beyond the maximum of seven years)....

*Id.* (Tenure (lettering, numbering and footnote omitted)).

27. A faculty member either is nominated or applies for tenure. *Id.* (Personnel Services (Tenure Awards)). The applicant or nominee is "responsible for developing and submitting to the department chair[ ] a packet of supporting materials." *Id.* (same)

28. The decisionmaking process regarding tenure nominations and applications entails the following:

Each "Promotion/Tenure Application," including all supporting materials, ... [is] evaluated by all tenured faculty from the applicant/nominee's department with regard to the candidate's credentials, performance as a faculty member, and the programmatic needs of the department. Each tenured faculty member ... submit[s] a written recommendation to the department chair[ ] that the candidate be granted or not granted tenure, with supporting comments. (If there are no tenured members

in the candidate's department, this step [is] ... omitted.)

The chair[ ] of the candidate's department evaluate[s] the packet of materials submitted by the candidate and ... forward[s] these materials, along with his/her recommendation with supporting comments and the recommendations of the tenured faculty of the department, to the dean. . . .

Each application/nomination for tenure, including all supporting materials, ... [is] evaluated by a [college] tenure panel with regard to the candidate's credentials and performance as a faculty member. The dean ... constitute[s] the review panel. The panel consist[s] of one tenured member from each department in the [college]. The panel member from the department should not be the department chair[ ] unless there are no other tenured faculty in the department. Each panel member review[s] the supporting materials prepared by the candidate and ... submit[s] a recommendation to the dean ... that the candidate by [sic] granted or not granted tenure, with supporting comments.

The dean ... evaluate[s] the packet of materials submitted by the candidate and ... review[s] the recommendation of the department chair[ ], the recommendations of the tenured faculty of the candidate's department, and the recommendations of the [college] panel as a basis for his/her recommendation to the Vice President for Academic Affairs. The dean's recommendation that the candidate be granted or not granted tenure and supporting comments ... [are] submitted to the Vice President for Academic Affairs, along with the packet of materials prepared by the candidate and the recommendations generated at each preceding stage of the evaluation. The Vice President for Academic Affairs ... review[s] these materials and recommendations and any other evidence deemed pertinent as a basis for his or her recommendation to the President of the University that the candidate be granted or not granted tenure. The Vice President for Academic Affairs ... submit[s] to the President ... his/ her recommendation, along with all supporting materials and the recommendations generated at each preceding stage of the evaluation.

The President ... review[s] these materials and recommendations and any other evidence deemed pertinent as a basis for his/her recommendation to the Board of Regents that the candidate be awarded tenure.

Tenure is awarded by action of the Board of Regents. . . .

*Id.* (same); *see also* Joint Ex. 502.

### *Pay Policies & Practices*

29. SFA annually enters into a new contract with each faculty member. *See* Joint Ex. 499B (Personnel Services (Compensation in Excess of Base Salary)).

30. A non-administrative faculty member's contract covers the academic year, which begins on September 1 and ends on May 31. *See id.* (same); *see also id.* (Tenure).

31. A department chair's contract covers a period longer than the academic year (e.g., 10 or 11 months). *See* Joint Ex. 499B (Personnel Services (Chairman Teaching Load)).

### *Initial Salary*

32. A faculty member's initial pay at SFA "is a market-determined figure based on [his/her] ... qualifications (including initial rank and past performance) and what persons of similar qualifications are being paid at other institutions." Joint Ex. 435 (Defs.' Resp. to Pls.' Second Set of Interrogs. on Class Issues (Memorandum from Fisher to Ashley of 4/14/94, at 2)).

33. Budgetary constraints sometimes limit the amount available to fund a faculty member's starting salary. *See, e.g., id.* (same); Defs.' Ex. 75 (comparison 24).

### *Promotion*

34. Prior to 1978, SFA's Recommendation for Promotion form apparently provided the only written disclosure of the criteria for elevation to a higher academic rank. *See, e.g.,* Joint Ex. 130 (Sylvia McGrath's personnel file (Recommendation for Promotion of 2/23/73)).

35. SFA enacted a written policy regarding academic promotion in 1978. *See* Joint

Ex. 499B (Personnel Services (Academic Promotion)). That policy, which continues to govern, *see id.* (same), states the following:

> In order to hold either of the upper two professional ranks, an individual is expected to have some previous teaching experience and to have held a lower rank. Ordinarily to be promoted to the rank of Associate Professor, an individual should have held the rank of Assistant Professor for at least five years. To be promoted to the rank of Professor, an individual should have held the rank of Associate Professor for at least five years.

*Id.* (same). It also outlines an application process for promotion that generally mirrors the one for tenure. *Compare id.* (same) *with id.* (Tenure Awards).

36. A salary increase accompanies promotion to a higher academic rank. Joint Ex. 435 (Memorandum from Fisher to Ashley of 4/14/94, at 2).

37. For the 1986–87 academic year, SFA made the following awards: $450 for promotion from instructor to assistant professor; $900 for promotion from assistant professor to associate professor and; $1350 for promotion from associate professor to professor. Defs.' Ex. 74.

38. For 1987–88 academic year, SFA made the following awards: $750 for promotion from instructor to assistant professor; $1000 for promotion from assistant professor to associate professor and; $1250 for promotion from associate professor to professor. *Id.*

39. Between academic years 1988–89 and 1994–95, SFA made the following awards: $750 for promotion from instructor to assistant professor; $1000 for promotion from assistant professor to associate professor and; $1500 for promotion from associate professor to professor. *Id.*

**Merit Pay Raises**

40. "Three levels of merit pay [raises (merit) ]—departmental[ ], . . . [college], and University—[are] available annually to quali-

fied faculty members." [7] Joint Ex. 499B (Evaluation, Merit Pay, Promotion and Tenure).

41. Some academic years, faculty members receiving promotion are ineligible for any merit pay raise. *See, e.g.,* Joint Ex. 435 (Memorandum from Gregory to Ashley of 4/6/94, at 2); Defs.' Ex. 75 (comparison 29).

42. "Outstanding teaching, performance [sic] scholarly activity, and public service . . . constitute the basis for awarding departmental[ ] [level] merit. . . . For each of those three categories, . . . each department[ ]. identif[ies] specific characteristics pertinent to its role within the University-wide mission and purpose." Joint Ex. 499B (Evaluation, Merit Pay, Promotion and Tenure).

43. "Outstanding service to a [college], as well as meritorious teaching, performance/scholarly activity, and service, . . . constitute the basis for awarding [college level] merit. . . . For each of those activities, . . . the school . . . identif[ies] specific characteristics pertinent to its role within the University-wide mission and purpose." *Id.* (same).

44. "Outstanding service University-wide, as well as meritorious teaching, performance/scholarly activity, and service, . . . constitute the basis for awarding University [level] merit. . . . For each of those activities, the Graduate Council . . . identif[ies] specific characteristics pertinent to the University-wide mission and purpose." *Id.* (same).

45. "A faculty member may apply or be nominated by a colleague or an administrator for any level or all levels of merit." [8] *Id.* (same). "To apply or to complete a nomination, a faculty member must submit to the appropriate administrator a completed 'Annual Report on Teaching, Scholarly/Creative Activities, and Service' report of his/her activities during the preceding year and any other pertinent information that may be requested." *Id.* (same).

---

7. Beginning in academic year 1992–93, SFA no longer granted university level merit. *See* Joint Ex. 435 (Memorandum from Fisher to Ashley of 4/14/94, at 2); Defs.' Ex. 74.

8. Despite this express policy, some departments refrain from nominating their members for merit.

46. The decisionmaking process for departmental level merit applications and nominations entails the following:

> The supporting documentation ... [is] reviewed by the [department] chair[ ] ... and, optionally by the departmental[ ] faculty, an elected panel of faculty members. Recommendation[ ] by the chair[ ] [is] made to the academic dean for further recommendation to the Vice President for Academic Affairs. The Vice President ... make[s][sic] recommendation to the President for final approval.

*Id.* (same).

47. The decisionmaking process for college level merit applications and nominations involves the following:

> The supporting documentation ... [is] reviewed by the academic dean and a panel of elected faculty members from each department[ ] within the [college] (the [College] Council may be utilized). Recommendation by the dean and the faculty panel ... [is] made to the Vice President for Academic Affairs. The Vice President ... make[s][sic] recommendation to the President for final approval.

*Id.* (same).

48. The decisionmaking process for university level merit applications and nominations entails the following: "The supporting documentation ... [was] ... reviewed by the Dean of the Graduate School and the Graduate Council. Recommendation by the Graduate Dean and Graduate Council [was] made to the Vice President for Academic Affairs. The Vice President ... [made a] recommendation to the President for final approval." [9] *Id.* (same).

49. Review of applications and nominations for merit occurs during the academic year subsequent to the academic year to which they relate. Merit pay raises become effective at the start of the academic year following that academic year. *See, e.g.,* Defs.' Ex. 75 (comparison 1).

50. For the 1986–87 academic year, no faculty member received a salary increase based on merit. Defs.' Ex. 74.

51. Every salary increase based on a level of merit that was made between academic years 1987–88 and 1990–91 was worth $450. *Id.*

52. For the 1991–92 academic year, no faculty member received a salary increase based on merit. *Id.* Because of this circumstance, SFA officials decided to use the 1992–93 academic year appropriation for merit to fund not only awards effective beginning in academic year 1992–93, but also those authorized the prior academic year, which had gone unrealized. *See id.* They, however, limited the size of each level of merit to $225. *Id.*

53. For academic year 1993–94, departments and colleges received allocations for merit that they could distribute among recipients in varying amounts. Despite this more flexible system, some departments and colleges elected to grant $450 to every awardee. *Cf. id. But cf.* Defs.' Ex. 75 (comparison 9).

54. For academic year 1994–95, no faculty member received a salary increase based on merit. Defs.' Ex. 74.

### Across-the-Board Salary Increases

55. Either the state or SFA can effect an across-the-board salary increase for SFA faculty members. *See id.*

56. For academic year 1983–84, faculty members received a 5 percent across-the-board salary increase. *Id.*

57. For academic year 1984–85, faculty members received a 3 percent across-the-board salary increase. *Id.*

58. For academic year 1985–86, faculty members received a 3 percent across-the-board salary increase. *Id.*

59. For academic year 1986–87, faculty members received no across-the-board salary increase. *Id.*

60. For academic year 1987–88, faculty members received a 4 percent across-the-

---

**9.** Because SFA has eliminated university level merit, see supra note 7, this process no longer occurs.

board salary increase. *Id.* SFA identified this increase as one level of merit in faculty member contracts. Defs.' Ex. 74; *see also* Joint Ex. 435 (Memorandum from Gaylord to Ashley of 4/8/94, at 3–5).

61. For academic year 1988–89, faculty members received a 7 percent across-the-board salary increase. Defs.' Ex. 74. SFA identified this increase as one level of merit in faculty member contracts. *Id.; see also* Joint Ex. 435 (Memorandum from Gaylord to Ashley of 4/8/94, at 5–6).

62. For academic year 1989–90, SFA faculty members received a 4 percent across-the-board salary increase. Defs.' Ex. 74. SFA identified this increase as one level of merit in faculty member contracts. Defs.' Ex. 74; *see also* Joint Ex. 435 (Memorandum from Gaylord to Ashley of 4/8/94, at 7–8).

63. For academic year 1990–91, faculty members received no across-the-board salary increase. Defs.' Ex. 74.

64. For academic year 1991–92, faculty members received a 2 percent across-the-board salary increase. *Id.*

65. For academic year 1992–93, faculty members received a 1 percent across-the-board salary increase. Id. They also were granted a $750 salary increase, which reflected a $1000 pay raise pro-rated over nine months.[10] Joint Ex. 434; Defs.' Ex. 74.

66. For academic year 1993–94, faculty members received a 3 percent across-the-board salary increase.[11] Defs.' Ex. 74.

67. For academic year 1994–95, faculty members received no across-the-board salary increase. *Id.*

68. At some point during the 1980s, SFA decided to deny across-the-board salary increases to those faculty members receiving terminal contracts.

69. Across-the-board salary increases perpetuate the disparity between the salaries of certain faculty members. *See, e.g.,* Defs.' Ex. 75 (comparison 28).

### Salary Adjustments

70. SFA awards some faculty members increases in compensation called salary adjustments.

71. A salary adjustment represents a response to the following scenario:

[E]xamination of faculty pay levels (usually by the department chair for members within his/her department) reveals that persons of similar rank, experience, and performance are not being paid similar pay rates. These differences do not arise intentionally but rather are a consequence of the way the pay system operates. When such an "inequity" is discovered, an "adjustment" is recommended by the department chair for the person being paid the lower amount.[12]

Joint Ex. 435 (Memorandum from Fisher to Ashley of 4/14/94, at 3).

72. Budgetary constraints frequently limit the number of salary adjustments that SFA is able to dispense. *See, e.g.,* Joint Ex. 6 (Ann Doyle–Anderson's personnel file (Letter from Reese to Moses of 9/2/87)); Joint Ex. 435 (Memorandum from Gregory to Ashley of 4/6/94, at 2); Pls.' Ex. 124.

### Policies Concerning Leaves of Absence

73. SFA's policy regarding leaves of absence for faculty members authorizes the granting of "a leave of absence, when departmental needs allow, for . . . [h]ealth, following the use of all accumulated sick leave, when it is demonstrated that at the end of the leave period the individual will be able to resume duties at SFA[ ]." Joint Ex. 499B (Personnel Services (Leave of Absence (indentation and numbering omitted))). It limits such leaves to no more than twelve months, *id.* (same), and makes the president responsible for disposing of all requests filed pursuant to it, *see id.* (same).

---

**10.** Although this pay raise applied effective January, 1992, it was not reflected in the SFA's printed budget or contracts until the 1992–93 academic year. Defs.' Ex. 74.

**11.** Although this pay raise applied on December 1, 1992, it was not reflected in SFA's printed budget or contracts until the 1993–94 academic year. *Id.*

**12.** Since the 1993–94 academic year, SFA has maintained a formal fund for salary adjustments known as the equity pool. *See id.*

74. SFA's policy regarding leaves of absence for classified employees permits the president to afford an unpaid leave of absence to any classified employee who has exhausted all of his or her accumulated paid leave. Joint Ex. 499B (Personnel Services (Leave of Absence)). It includes the following directive: "Pregnancies shall be treated as any other temporary disability. Each case shall be evaluated on its own merit." *Id.* (same).

75. SFA's policy regarding extension of sick leave applies to all university personnel.[13] *See id.* (Personnel Services (Extension of Sick Leave)). It states the following:

The President of the University may, under state law, make exceptions to the amount of sick leave an employee may take. Extensions of authorized sick leave will be approved on an individual basis following a review of the merits of each request. In general, extension of sick leave may be granted in an effort to allow University employees, who are experiencing extenuating circumstances due to illness, to resume productive employment. Among the factors to be considered in granting any extension of sick leave will be: the nature of the illness; a physician's assessment of the employee's condition; an assessment from the University department supervisor regarding the employee's special needs; and the employee's record of sick leave taken.[14]

*Id.* (same).

### Grievance Process for Probationary Faculty Members Failing to Receive Reappointment

76. SFA permits probationary faculty members "who ha[ve] been notified of non-reappointment ... [to] appeal [their] non-reappointment only on the presentation of a *prima facie* case that constitutional guarantees or academic freedom were violated." Joint Ex. 502.

77. Under this policy, a probationary faculty member receives a hearing with an advisory committee comprised of members of the University Grievance Panel. *Id.* When the advisory committee "finds probable cause that there was an abridgment of constitutional guarantees or academic freedom, [settlement] conferences between the faculty member and appropriate administrative officers of the University ... [are] scheduled." *Id.* If the conciliation effort fails, then a hearing committee of the University Grievance Panel reviews the probationary faculty member's case. *Id.* After doing so, it reports its decision and the basis for that determination in writing to the probationary faculty member and the president. *Id.* A "verbatim typewritten record of the hearing" accompanies this communication. *Id.*

78. This policy incorporates the following provisions of the grievance procedure for tenured faculty and probationary faculty with an unexpired appointment extending beyond the date of proposed dismissal:

If the Hearing Committee concludes that good cause for dismissal has not been established in the record and the President rejects the Committee's conclusion, he [or she] will state his [or her] reason(s) for doing so in writing to the Committee and the faculty member. The President will provide a reasonable time for response before transmitting the case to the Board of Regents.

When it is the President's final judgment to recommend dismissal, he [or she] will transmit to the Board of Regents a verbatim typewritten copy of the record of the hearing, the report of the Hearing Committee, and his recommendation regarding dismissal. If the recommendation of the President for termination conflicts with the recommendation of the Hearing Committee, the Board of Regents will review the case based on the record of the hearing with the opportunity for argument by the principals or their representatives. If the recommendations of the President and the Hearing Committee are in accord, the

---

**13.** SFA published its policy regarding sick leave in 1990. Joint Ex. 499B (Personnel Services (Sick Leave)).

**14.** This language mirrors that found in Texas' General Appropriations Act. *See* Defs.' Ex. 21; *see also* Joint Ex. 499B (Extension of Sick Leave).

Board of Regents may choose to limit its review to a review of the record of the hearing. Following the Board's decision, the chair[ ] will communicate the decision in writing through the President of the University to the chair[ ] of the Hearing Committee and the faculty member.

*Id.* (numbering omitted). Despite this circumstance, SFA officials regard these passages as inapplicable to probationary faculty members who fail to receive reappointment. *See* Pls.' Ex. 31; Pls.' Ex. 33. This attitude arises from their belief that dismissal occurs only in those instances in which a faculty member is discharged prior to the expiration of his or her term of appointment. Pls.' Ex. 31; Pls.' Ex. 33.

### Appearances Before the Board of Regents

79. SFA's *Board of Regents Rules and Regulations* include the following provision:

The Chair[ ] of the Board of Regents or the President may invite individuals to appear before the Board or one of its committees for specific purposes. Other individuals wishing to appear before the Board shall file a written request with the President at least seven working days before the appropriate meeting. The written request shall include a statement of the purpose for which an appearance is requested, the nature of the information to be presented and the names of those who will speak to the Board. The President will submit the request to the Chair[ ] of the Board, who will grant the request, deny the request or provide for an appearance before an appropriate committee of the Board. The individual making the request shall be notified of the Chair[ ]'s decision by the President.

Joint Ex. 499B (General Regulations (Appearances Before the Board of Regents)).

### HELENE BAKEWELL

#### Findings of Fact

80. Plaintiff, Helene Bakewell, received a Ph.D in clinical psychology from the University of Utah in 1972. Joint Ex. 496 (Helene Bakewell's personnel file (excerpts) (Curriculum Vitae)).

81. Bakewell worked as an assistant professor in Department of Psychology at Washington State University between 1971 and 1973. *Id.* (same).

82. Bakewell served as an assistant professor in the Department of Psychology at the University of Northern Colorado between 1973 and 1975. *Id.* (same).

83. Between 1975 and 1977, Bakewell worked as the principal investigator on a federal research grant project. *Id.* (same). During this period, she also taught classes in psychology at the University Northern Colorado.

84. Bakewell served as an assistant professor in Department of Psychology at the University of Northern Colorado between 1977 and 1979. *Id.* (same).

85. In 1979 and 1980, Bakewell taught at the University Northern Colorado's Center for Special and Advanced Programs. *Id.* (same).

86. Between 1980 and 1983, Bakewell worked as a mental health program representative in the Wyoming Department of Health and Human Services. Id. (same).

87. Bakewell became director of the Wyoming State Office of Mental Health and Social Services in 1983. Id. (same).

#### Employment History at SFA

88. In 1985, Bakewell ended her tenure as director of the Wyoming State Office of Mental Health and Social Services because her family had decided to move to Nacogdoches, Texas.

89. Prior Bakewell's arrival in Nacogdoches, Heinz Gaylord, Chair of SFA's Department of Psychology, invited her to meet with him to discuss the possibility of the department employing her.

90. In July, 1985, Bakewell contacted Gaylord. Gaylord offered her a part-time position. He stated that such a job suited a woman in her situation.

91. Bakewell declined this offer because she desired a tenure-track position. *See generally supra* ¶ 25.

92. In the spring of 1986, Bakewell saw an advertisement in a professional newsletter

for a tenure-track position in SFA's Department of Psychology. *Cf.* Joint Ex. 427 (Defs.' Resp. to Pl.'s First Interrogs. (Ex. XVI (answer regarding the vacancy that Bakewell filed))). The university intended to pay the person taking this job a salary between $21,000 and $23,000. *Id.* (same).

93. Bakewell applied for the position. Joint Ex. 496 (Letter from Bakewell to Gaylord of 5/7/86). During a conversation about it, Gaylord remarked that Bakewell's background made her deserving of a salary above the amount advertised and of an appointment to the rank of associate professor. He, however, subsequently stated that he favored her being appointed as an assistant professor and receiving a salary within the announced range. He also expressed his intention to recommend awarding her two years credit toward tenure. *Cf. id.* (Recommendation for Appointment).

94. Unhappy with Gaylord's offer, Bakewell appealed to the Dean of the School of Liberal Arts, James Reese, under whose purview the Department of Psychology fell. *E.g.,* Joint Ex. 427 (Ex. I). Reese rejected her entreaty. First, he favored her working at SFA for three years prior to becoming eligible for tenure. Second, he stated that SFA lacked the financial resources to accommodate her preference.

95. On July 1, SFA proposed hiring Bakewell as an assistant professor and awarding her two years credit toward tenure. Joint Ex. 496 (Letter from Brophy to Bakewell of 7/1/86); *cf. id.* (Recommendation for Appointment). Bakewell's dissatisfaction with this offer prompted her to meet with William Brophy, Interim Vice President for Academic Affairs. Brophy conceded that Bakewell's credentials supported her being appointed as an associate professor. He, however, reported that budgetary constraints prevented him from placing her in such a position. Because of this circumstance, he suggested a compromise under which she would enter SFA as an assistant professor

with three years credit toward tenure. On July 25, Bakewell agreed to this proposal.[15] Joint Ex. 496 (Letter from Brophy to Bakewell of 7/21/86).

96. The 1986–87 academic year marked the beginning of Bakewell's service at SFA. *See id.* (same). Her salary was $24,000. *Id.* (same).

97. SFA reappointed Bakewell for the 1987–88 academic year. *Id.* (Reappointment Notification of 8/26/87). Her pay rose to $24,960. *Id.* (same). This $960 increase reflected the 4 percent across-the-board salary increase awarded that year. *See supra* ¶ 60.

98. Based on her performance during the 1986–87 academic year, Gaylord recommended Bakewell for departmental and school level merit. Joint Ex. 496 (Administrative Evaluation for 1986–87). Brophy concurred. *See id.* (same). Bakewell subsequently was authorized for both levels of merit.

99. SFA reappointed Bakewell for the 1988–89 academic year. *Id.* (Reappointment Notification of 4/25/88). Her salary jumped to $27,157. *Id.* (same). This $2197 increase reflected the 7 percent across-the-board salary increase awarded that year and one level of merit.[16] *See supra* ¶¶ 51, 61.

100. In October, 1988, Bakewell applied for departmental and school merit based upon the work she had done during the 1987–88 academic year. Joint Ex. 496 (Memorandum from Bakewell to Gaylord of 10/6/88). Gaylord declined to recommend her for these awards because of concern about the quality of her teaching. *Id.* (Administrative Evaluation for 1987–88). Bakewell's request for merit ultimately was denied. *See Id.* (Reappointment Notification of 7/25/89).

101. During the 1988–89 academic year, Gaylord considered recommending Bakewell for a salary adjustment. *Id.* (Administrative Evaluation for 1987–88).

15. The initial offer to Bakewell had been withdrawn because of her failure to accept it by July 7. *See* Joint Ex. 496 (Letter from Brophy to Bakewell of 7/1/86).

16. Although she had been authorized for both departmental and school level merit based upon her performance during the 1986–87 academic year, *supra* ¶ 98, Bakewell only received one level of merit because of budgetary constraints.

102. Bakewell received a terminal contract for the 1989–90 academic year because the Board of Regents had denied her application for tenure in April, 1988. *See id.* (Reappointment Notification of 7/25/89) (Letter from Reese to Bakewell of 5/8/89).

103. This contract included no salary adjustment. (*Id.* Reappointment Notification of 7/25/89).

104. Bakewell's failure to receive tenure foreclosed her from receiving the 4 percent across-the-board salary increase awarded for the 1989–90 academic year. *See supra* ¶¶ 62, 68.

105. Bakewell's salary for the 1989–90 academic year, consequently, remained $27,157. *See* Joint Ex. 496 (Reappointment Notification of 7/25/89).

### Tenure Candidacy

106. Bakewell filled a clinical psychologist vacancy in SFA's Department of Psychology in 1986. See Joint Ex. 427 (Ex. XVI (answer regarding the vacancy that Bakewell filled)).

107. In the late 1970s, the Department of Psychology had established the following principles to guide the operation of its psychology clinic: open communication among faculty members about their activities and coverage of a variety of psychological methods in the clinical curriculum.

108. When Bakewell began her service at SFA, Gaylord encouraged her to maintain good communications with the other two members of the Department of Psychology working in the clinical area, Verna Barron and Raymond Eastman. He also told her that Barron and Eastman tended to make decisions informally.

109. Barron informed Bakewell of an understanding that all members of the clinical faculty could visit the clinical practicum for the department's graduate program (practicum) whenever they desired.

110. During the spring semester of the 1986–87 academic year, Barron taught the practicum. She invited Bakewell to the course's final session. Bakewell attended.

111. That same term, Gaylord announced Bakewell's assignment to teach the practicum the next fall. Barron commented to Bakewell that she disagreed with this decision and intended to seek its reversal.

112. Barron's statement reflected her belief that Bakewell lacked the qualifications to lead the practicum without supervision.

113. Bakewell apprised Gaylord of Barron's view. The department chair responded that Bakewell was competent to teach the practicum without supervision. Bakewell informed Barron of that Gaylord considered her capable of leading the course.

114. In August, 1987, Bakewell received a letter from Reese stating that she was making satisfactory progress toward tenure. See Joint Ex. 496 (Reappointment Notification of 8/26/87 ("Letter No. 3 attached")).

115. Prior to the fall semester of the 1987–88 academic year, Bakewell discovered that the graduate student assigned to assist her with the practicum, Donna Teafatiller, had never completed that course. Bakewell asked Gaylord about this situation. Gaylord responded that he was under the impression that the department's clinical training committee had selected Teafatiller to serve as the graduate assistant for the practicum.[17] After learning from Bakewell that the committee had not done so, he surmised that Barron and Eastman had chosen Teafatiller and then had portrayed their decision to him as that of the committee. He indicated that similar situations had occurred previously.

116. Gaylord asked Bakewell to insure that the clinical training committee actually performed its duties in the future. Bakewell did not assume this responsibility because of worry about stirring resentment among her colleagues.

117. Before the first practicum meeting of the semester, Barron expressed to Bakewell a desire to present a case study during that session. Pls.' Ex. 122. Because she worried that Barron really wanted to appear before the class to undermine her authority, Bakewell asked Barron to deposit the case study materials in the psychology clinic and

---

**17.** At that time, Bakewell, Barron, Eastman and Bruce Bailey, who held a degree in clinical psychology but specialized in community psychology, served on this committee.

reported that no case study reviews would occur during the initial class session. Pls.' Ex. 123. Barron complied with Bakewell's request. She also refrained from attending the practicum meeting.

118. In March, 1988, Gaylord told Eastman of his intention to assign Bakewell to teach the practicum for the upcoming fall term. This comment prompted Eastman to declare that a need existed to discuss some problems with Bakewell's instruction of that course the previous semester.

119. After learning about Eastman's remark from Gaylord, Bakewell arranged a meeting with Barron, Eastman and Gaylord to review concerns about her conduct of the practicum.[18] Joint Ex. 464. Prior to that session, Gaylord spoke with the four students whom had been enrolled in the practicum that Bakewell had taught. He also reviewed their respective evaluations of the course. Joint Ex. 431 (Gaylord's list of major points of student feedback on Bakewell's practicum supervision); Pls.' Ex. 13 (Bakewell's notes of 4/20/88 meeting).[19]

120. Bakewell, Barron, Eastman and Gaylord gathered on April 18 and 20, 1988, to discuss Bakewell's practicum instruction. Joint Ex. 431 (Gaylord's notes of 4/18/88 and 4/20/88 meetings).

121. Eastman stated that a practicum participant had criticized Bakewell for teaching only one theoretical approach. Id. (Gaylord's notes of 4/18/88 meeting); Pls.' Ex. 13 (Bakewell's notes of 4/18/88 meeting). He also expressed concern about a practicum member's report that Bakewell had used a group therapy technique during class meetings. Pls.' Ex. 13 (Bakewell's notes of 4/18/88 meeting).

122. Barron voiced worry about the disclosure regarding Bakewell's employment of a group therapy technique. See Joint Ex. 431 (Gaylord's notes of 4/18/88 meeting); Pls.' Ex. 13 (Bakewell's notes of 4/18/88 meeting). She also admonished Bakewell for exercising too much supervision over practicum participants. See Joint Ex. 431 (Gaylord's notes of 4/18/88 meeting); Pls.' Ex. 13

(Bakewell's notes of 4/18/88 meeting). Finally, she complained that Bakewell had failed to stress personality assessment training sufficiently. See Joint Ex. 431 (Gaylord's notes of 4/18/88 meeting); Pls.' Ex. 13 (Bakewell's notes of 4/18/88 meeting).

123. Bakewell revealed that she had telephoned the American Psychological Association (APA) about the manner in which the charges about her teaching were being addressed. Joint Ex. 431 (Gaylord's notes of 4/20/88 meeting); Pls.' Ex. 13 (Bakewell's notes of 4/20/88 meeting). Eastman commented that this action epitomized Bakewell's uncooperativeness. Pls.' Ex. 13 (Bakewell's notes on 4/20/88 meeting). He alluded to her rebuff of Barron's request to attend the practicum's first session as additional evidence of this attitude and groused about her failure to invite him to the class so that students could learn about his role as the psychology clinic director. Id. (same).

124. In response to Eastman's concern about her focusing on just one theoretical approach, Bakewell stated that she had exposed students to a variety of methods. Id. (Bakewell's notes of 4/18/88 and 4/20/88 meetings). She also maintained that, even if she had decided to concentrate on a single paradigm, academic freedom would have safeguarded such a choice. Id. (Bakewell's notes of 4/20/88 meeting).

125. As to the allegation regarding the use of a group therapy technique, Bakewell related that she had employed the method in question only after receiving confirmation of its appropriateness from the APA. Id. (same).

126. Bakewell asserted that the degree to which she supervised practicum members was necessary because of their inexperience. Id. (same). She also declared that Barron's complaint about this matter violated her academic freedom.

127. Bakewell replied to Barron's criticism about the lack of emphasis on personality assessment training with the assertion that she had encouraged course participants

---

18. Bakewell rejected Gaylord's suggestion that she meet with Barron and Eastman alone.

19. Plaintiffs' exhibit 13 misreports this meeting as occurring on April 30, 1988. Pls.' Ex. 13.

to conduct personality assessments. *Id.* (same). She, moreover, contended that academic freedom protected her judgment about the extent to which she required students to conduct personality assessments. *Id.* (same). She underscored this point by observing that the Graduate School *Bulletin's* description of the practicum made no mention of personality assessments and that no written policy required the performance of a particular number of personality assessments as part of the practicum. *See id.* (Bakewell's notes of 4/20/88 meeting).

128. Gaylord reported that a complaint he had received about vague grading criteria for the practicum lacked merit.

129. At the conclusion of the April 20 meeting, everyone agreed to maintain better communication. *E.g.*, Joint Ex. 431 (Gaylord's notes of 4/20/88 meeting).

130. Eastman stated that Bakewell had assuaged his concern about the practicum's theoretical orientation. *Id.* (same).

131. Although Gaylord still harbored doubt about Bakewell's group technique, he refrained from expressing this reservation because he hoped that the clinical faculty would resolve outstanding concerns regarding that matter. He, consequently, just told Bakewell that he had no worries about her practicum instruction. Pls.' Ex. 13 (Bakewell's notes of 4/20/88 meeting).

132. On April 25, Bakewell received a letter from Reese indicating that her progress toward tenure was satisfactory. *See* Joint Ex. 496 (Reappointment Notification of 4/25/88 ("Letter # 3 attached.")).

133. Bakewell submitted an application for tenure and promotion to associate professor on October 6.[20] *See* Joint Ex. 442 (Application for Tenure and Promotion (Memorandum from Bakewell to Gaylord of 10/6/88)). It included the following: her Texas psychol-

ogist's license; her curriculum vitae; her 1987–88 Annual Report on Teaching, Scholar/Creative Activities, and Service; student evaluations from her courses[21]; certificates of continuing education and; letters of recommendation from individuals with whom she had worked. *Id.* (application materials).

134. On October 18, Gaylord told Bakewell that her tenure and promotion applications were circulating. He also stated that he foresaw no problems with the review process. Finally, he expressed a desire to meet with Bakewell personally to discuss her faculty evaluation for the 1987–88 academic year.

135. In an October 19 memorandum regarding Bakewell to SFA's president, William Johnson, Gaylord commented that "Bakewell has been, and I assume will continue to be, a conscientious and contributing member of . . . [the psychology] department." Pls.' Ex. 100.

136. Each of the eight tenured faculty members in the Department of Psychology reviewed Bakewell's application for tenure, as well as her request for promotion, during late October. *See* Joint Ex. 477.

137. Four of these persons, Bailey, Walter Bourbon, James Speer, and Wayne Wilson recommended granting tenure, while three of them, John Anson, Barron and Eastman, opposed such action. *See id.* The other tenured member of the department, Jerry Lackey, abstained.[22]

138. None of the four faculty members who supported Bakewell's tenure application provided an extensive explanation for his view. *See* id. In contrast, each of the three naysayers offered specific reasons for his or her position. *See id.*

139. Anson cited poor student evaluations for graduate courses "in certain critical areas, such as lecture style," the apparent absence of any active research efforts or admin-

---

**20.** Although Bakewell submitted a single application, Gaylord directed his colleagues in the Department of Psychology to consider the requests for tenure and promotion separately. Defs.' Ex. 35.

**21.** Bakewell included some student evaluations in her application for tenure and promotion and placed others in a concurrent request for merit.

Joint Ex. 442 (Memorandum from Bakewell to Gaylord of 10/6/88).

**22.** Lackey subsequently served on the School of Liberal Arts panel that reviewed Bakewell's application for tenure and promotion. See Joint Ex. 472. As a member of that committee, he supported her tenure candidacy. *Id.*

istrative accomplishments and unfamiliarity with Bakewell's work as the bases for his opposition. *Id.*

140. After considering her personal experiences with Bakewell, conversations with students, and practicum records, Barron offered the following assessment:

> Dr. Bakewell has many excellent qualities. She had adequate training experience and has sought to remedy her deficits as they affect graduate student supervision and teaching. We need her expertise for programmatic needs. Because of our programmatic needs, however, I do not recommend tenure. Clinical faculty, more than any other, must work cooperatively. I cannot trust any verbal exchange I have with her. Initial agreeableness turns to very different perception later. I cannot trust her clinical judgment. She has emphasized teaching form, but actual learning appears minimal in undergraduate classes. There was a failure in substance with graduate students. They did not learn/are not exposed to things of critical relevance and were not given feedback that would encourage their development of judgment. Poor judgment was employed to ask a 2nd year grad student to grade content reports of personality assessment, to have her (the student) make up and score quizes [sic] for other graduate students. In more than one class, allegations of bias were made relative to grading, based on student acquiescence; a student that challenged procedures was subject to harsher grading. Dr. Bakewell has not contributed to our clinical team in a cooperative manner, everything must be done her way. We need clinical faculty, but in many ways, she has made it more difficult to teach, not better. I cannot look forward to . . . .

*Id.*[23]

141. Eastman cited Bakewell's lack of team-orientedness as the reason for his vote against her tenure application. *Id.*

142. On November 3, Gaylord told Bakewell that he planned to summarize the faculty recommendations on her tenure application by Thanksgiving and expected to discuss specific comments with her after she returned to SFA the following January.[24]

143. Between November 17 and December 1, six members of the School of Liberal Arts faculty each assessed Bakewell's application for tenure. *See* Joint Ex. 472. Although five of these persons recommended granting her tenure, only one of them ranked her the better of the two candidates from the school. *See id.*

144. On December 9, Gaylord met with Brophy, Dean of the School of Liberal Arts,[25] about his evaluation of Bakewell for the 1987–88 academic year. See Joint Ex. 496 (Administrative Evaluation for 1987–88). This session came after he had endeavored to meet with Bakewell personally about his assessment. The following comment in his review reported this circumstance:

> Dr. Bakewell has been on maternity leave and sick leave since the end of September 88 and due to complications with her pregnancy will not be returning until next semester. I have deferred my annual evaluation of Dr. Bakewell as long as possible to optimize an in person annual conference to discuss the previous years [sic] performance but realize now this is no longer workable and am instead mailing my evaluation to Dr. Bakewell for her comments/signature.[26]

*Id.* (same).

145. Gaylord's evaluation included the following:

> [S]ome organizational and procedural problems in the Clinical Practicum course—Meetings with other faculty su-

---

**23.** Neither the copy of Barron's evaluation appearing as part of joint exhibit 477 nor any other evidence discloses Barron's remaining comments. *See* Joint Ex. 477; Pls.' Ex. 14.

**24.** Beginning on September 26, Bakewell had been absent from campus because of conditions related to pregnancy.

**25.** Brophy had assumed this post in August, 1986.

**26.** Gaylord presumably offered this statement as an explanation for his failure to follow the procedure for faculty evaluations in this instance. *See generally supra* ¶ 23.

pervisors of the Clinical Practica and myself were held and lines of communication/expectations were developed.... Student evaluations of the undergraduate classes were again positive however the graduate course while positive overall indicated some organization problems and some student concerns over clearly communicating grading/evaluation criteria.

The graduate assistant for the laboratory assumed major responsibility for exam/quiz preparation—this needs to be discussed.

*Id.* (same).

146. Gaylord expressly refrained from recommending Bakewell for merit. *Id.* (same). He, however, stated that he would consider her, as well as others in the Department of Psychology, for a salary adjustment. *Id.* (same).

147. Brophy concurred with Gaylord's evaluation. *Id.*

148. Gaylord's evaluation became part of Bakewell's application for tenure and promotion. *See supra* ¶ 22.

149. On December 13, Gaylord advised against granting Bakewell tenure because of "insufficient support" in the Department of Psychology for her candidacy. Joint Ex. 478. He, specifically, pointed to the schism among the tenured faculty over her application. *Id.*

150. Although Gaylord simply reported the number of recommendations for and against Bakewell's application, that circumstance had swayed him little. Rather, the opposition of Barron and Eastman, as well as problems with Bakewell's graduate course instruction, had determined his recommendation.

151. Before reaching a decision on whether or not to endorse Bakewell's tenure candidacy, Gaylord had reviewed the following: individual psychology faculty recommendations on Bakewell's tenure application; Bakewell's annual reports on teaching, scholarly/creative activities, and service; student evaluations of courses that Bakewell had taught; his meetings with Bakewell; solic-ited and unsolicited comments from graduate students about Bakewell made over the course of her two years at SFA and; information from the department's secretary about Bakewell's activities. *See* Joint Ex. 431.

152. On December 14, Brophy recommended denying Bakewell tenure for two reasons. Joint Ex. 478. First, he observed the lack of a "consensus in favor of tenure in the Department of Psychology." *Id.* Second, because Bakewell had failed to receive backing for promotion from either a majority of her tenured colleagues in the Department of Psychology or a majority of the members of the School of Liberal Arts panel, Joint Ex. 431 Gaylord's vote tally (reporting only one tenured member of the Department of Psychology as supportive of Bakewell's request for promotion); *see* Joint Ex. 472 (disclosing that the School of Liberal Arts panel had split evenly on Bakewell's promotion application), he invoked his unwritten, personal policy of advising against an award of tenure to any person not securing "a favorable recommendation for promotion." [27] *Id.*

153. Although he failed to disclose it, Brophy also found problematic the absence of scholarly publications by Bakewell since her arrival at SFA.

154. Before making his recommendation, Brophy had reviewed all of the faculty recommendations concerning Bakewell's candidacy. The views of Barron and Eastman had strongly influenced him.

155. On January 20, 1989, Bakewell wrote a letter to Brophy in which she challenged certain aspects of Gaylord's evaluation of her performance during the 1987–88 academic year. Joint Ex. 452. She, specifically, protested the following: Gaylord's reference to difficulties surrounding the practicum; Gaylord's failure to apprise her of criticisms about the practicum until after discussing them with students and other faculty members; Gaylord's portrayal of the student evaluations for her courses; Gaylord's characterization of her grading crite-

---

**27.** Although this policy was unwritten, Brophy did announce it at the faculty meeting held at the start of each academic year.

ria for the graduate personality assessment class that she had taught, and; Gaylord's depiction of how her graduate assistant for the personality assessment course had been involved in the preparation of quizzes and examinations. *Id.*

156. Bakewell presented Gaylord with a copy of her letter to Brophy during a January 23 meeting about the evaluation.

157. On March 1, Reese, the Vice President for Academic Affairs,[28] counseled against granting Bakewell tenure. Joint Ex. 478. He stated that, "[l]ike the Dean, the concerns raised by the divided vote in the department and the reservations of the chairman lead me to recommend against granting tenure." *Id.* This position reflected a determination that personal and philosophical differences between Bakewell and her two clinical colleagues, Barron and Eastman, jeopardized the psychology clinic's effective operation. Although he failed to state so expressly, Reese's view also rested upon concern about the quality of Bakewell's graduate course instruction.

158. Reese had discussed Bakewell's situation with Brophy and Gaylord and had reviewed student evaluations of her graduate courses before making his recommendation.[29]

159. On March 22, Johnson advised against granting Bakewell tenure without comment. Joint Ex. 478. Although he failed to articulate them, several concerns had prompted his position.

160. First, Johnson had found the comments of Barron and Eastman about Bakewell disquieting. He had asked Reese why the problems concerning Bakewell had failed to surface prior to the tenure review process. The Vice President had replied that Bakewell's arrival at SFA only two years earlier explained that circumstance.

161. Second, Johnson had deemed Bakewell's student evaluations mixed and her research efforts since coming to SFA limited.

162. Johnson apprised the Board of Regents of his position regarding Bakewell's

tenure candidacy. He made her application available to board members for review.

163. The Board of Regents failed to reverse Johnson's recommendation to deny Bakewell tenure. On April 26, Brophy informed Bakewell of this decision.

164. Because she had failed to receive tenure, Bakewell received a terminal contract from SFA for the 1989–90 academic year. *See supra* ¶ 102.

### *Extended Sick Leave With Pay Request*

165. On March 21, 1988, Bakewell informed Gaylord that she was pregnant. She stated that her delivery date was in late October or early November. Although she expressed a desire to teach as long as possible before the birth of her child, she observed that her pregnancy was high-risk because of her age.

166. Gaylord identified mid-October as Bakewell's date of departure. He told her that graduate students would teach her undergraduate courses and that another member of the department's faculty would lead her graduate course once she began her leave of absence. *See* Defs. Ex. 40. He anticipated her return the following January. *Cf.* Defs.' Ex. 46.

167. Gaylord assured Bakewell that she would receive her salary throughout her absence.

168. On April 11, Bakewell informed Brophy of her pregnancy and Gaylord's plan for accommodating it. Brophy remarked that Gaylord's strategy reflected routine practice. He also stated that Bakewell would receive her salary during her absence.

169. Bakewell's health began to deteriorate that summer. Because of this situation, Bailey volunteered to assume responsibility for her fall graduate course if complications required her to leave campus before mid-October.

170. On September 26, Bakewell's obstetrician ordered her to the hospital for the remainder of her pregnancy. Bakewell, how-

---

**28.** Reese had assumed this job in 1986.

**29.** Reese had met with Gaylord once and with Gaylord and Brophy twice.

ever, persuaded him to confine her to bedrest at home.

171. On September 27, Bakewell related to Gaylord that she had been restricted to bedrest. She stated that she would alert Bailey of the need for him to teach her graduate class.

172. Bakewell failed to disclose how her condition affected her ability to continue working. This omission caused Gaylord to believe that Bakewell's illness was treatable. That assumption, along with Bakewell's recent submission of an application for outside employment, led him to conclude that she might return to campus prior to the commencement of her scheduled leave of absence in mid-October.

173. On October 18, Gaylord telephoned Bakewell to ask if she expected to return to campus before her delivery date. Bakewell stated that her condition precluded her from doing so.

174. Gaylord disclosed that he was charging Bakewell with sick leave with pay for the period preceding the birth of her child. According to him, maternity leave would cover the time following that event.

175. Gaylord also reported his intention to send a memorandum to Johnson requesting maternity leave for Bakewell. Bakewell asked him to send her a copy of this communication.

176. During this conversation, Bakewell complained to Gaylord about his references to "maternity leave." He agreed to refrain from using this phrase.

177. On October 19, Gaylord sent a memorandum to Johnson, via Reese, in which he stated the following:

Dr. Bakewell as of October 1988 accrued 192 hours of sick leave. According to my calculations Dr. Bakewell will run out of sick leave at the end of October.

Originally I planned to request paid maternity leave for Dr. Bakewell beginning around the end of October/beginning November and extending for the duration of the semester. I am now requesting paid maternity leave for Dr. Bakewell beginning at the point in time when her sick leave expires (Oct. 31, 1988).

Pls.' Ex. 100. After receiving this communication, Reese telephoned the department chair about Bakewell's situation. Although Gaylord exhorted approval of his request, the Vice President only promised to consider it.

178. Reese subsequently advised against granting Gaylord's request to provide Bakewell with extended sick leave with pay.[30] Joint Ex. 465. Prior to making this recommendation, he had been told by Robert Provan, SFA's legal counsel, that the law required the university to provide the same benefits to faculty and classified employees.[31] Pls.' Ex. 37; see also Joint Ex. 465. Based upon this report, he had reasoned that affording Bakewell extended sick leave with pay would establish an institutional obligation to provide the same benefit to all classified employees who exhausted their sick leave with pay during pregnancy. See Joint Ex. 465. Because that outcome would precipitate a significant budgetary commitment, he decided to counsel against granting Gaylord's request to award Bakewell extended sick leave with pay. See id.

179. Finding Reese's rationale persuasive, Johnson approved the recommendation not to accord Bakewell extended sick leave with pay. Id. He also chose to award Bakewell extended sick leave without pay. Cf. Joint Ex. 496 (relevant Personnel Action Request).

180. On November 3, Reese telephoned Gaylord to report that Johnson had refused to provide Bakewell with extended sick leave with pay. Gaylord re-urged his request. In doing so, he disclosed that Bakewell had worked at home during her absence from SFA and demanded that she receive compensation for that effort.[32] Reese eventually

---

**30.** Throughout the remainder of this memorandum opinion, the court refers to benefit that Gaylord sought for Bakewell as extended sick leave with pay.

**31.** Provan had first advised Reese of this dictate in the summer or early fall of 1988.

**32.** While at home, Bakewell had prepared and scored examinations, graded student papers, conducted phone conferences with the persons

decided to recommend paying Bakewell 33 percent of her November salary and 33 percent of her December salary for her work at home.

181. On November 4, Gaylord received a copy of his October 18 memorandum. In a cover memorandum, Reese stated, "I don't think I had any choice given the federal rules about equity in these matters." Pls.' Ex. 9.

182. Gaylord informed Bakewell that his request for her to receive maternity leave had been denied. In doing so, he told her that Texas law failed to provide for maternity leave.

183. Gaylord also stated that Bakewell had exhausted her sick leave with pay. He, however, alerted her that Reese had devised a plan to pay her 33 percent of her November salary and 33 percent of her December salary as compensation for the work that she had performed at home. He noted that under such an arrangement Bakewell would become liable for payment of her November and December health insurance premiums.

184. On November 7, Bakewell telephoned Gaylord about her pay situation. He reiterated the unavailability of maternity leave, as well as the exhaustion of her sick leave with pay, and apprised her of the decision to provide her with extended sick leave without pay. He also reported Reese's decision to recommend awarding her 33 percent of her November salary and 33 percent of her December salary as compensation for the work that she had performed at home. Finally, he explained that the refusal to award her extended sick leave with pay arose from a fear that doing so would create a distinction between faculty members and classified employees as to the nature of leave benefits.

185. Later that day, Bakewell spoke with Reese. She complained about the scheme to pay her 33 percent of her salary for November and 33 percent of her salary for Decem-

ber for her work at home and about his focus on her pregnancy.

186. Bakewell also asked for a written explanation of Reese's recommendation regarding her pay.[33] Although Bakewell failed to articulate either one to Reese, two concerns motivated her request. First, she felt that SFA had broken its promise to pay her during her pregnancy. Second, she believed that SFA officials were discriminating against her based on sex.

187. Reese replied that he only had made a note at the bottom of Gaylord's memorandum and had returned that document to its author.[34] He, however, promised to provide Bakewell with written notification of his recommendation on how to compensate her for the work that she had done during her absence from campus.

188. That same day, Gaylord sent Bakewell a copy of his October 18 memorandum. *See* Pls.' Ex. 101. Bakewell subsequently received this item.

189. Reese revised his strategy for compensating Bakewell for her work at home after SFA's payroll office apprised him that the state would cover her health insurance premiums only if she received 50 percent or more of her salary. His new scheme provided her with 50 percent of her November salary and none of her December salary. See Joint Ex. 496 (relevant Personnel Action Requests).

190. On November 16, Bakewell telephoned Reese. The Vice President reported his new strategy for compensating her for the work that she had done at home. He explained that SFA only would refrain from paying her health insurance premium for December under this plan.

191. Bakewell protested the university's refusal to provide her with extended sick leave with pay and the fixation on her pregnancy. Reese replied that a decision to

who had assumed responsibility for her fall classes, spoken with a colleague about a research project and held a meeting with a student whom she was directing in special programs work.

33. Bakewell failed to indicate clearly the particular recommendation for which she desired a written explanation. *See, e.g.,* Pls.' Ex. 1.

34. Reese misspoke as to this matter. He also had provided Gaylord with a cover memorandum. *See supra* ¶ 181.

grant her extended sick leave with pay would have imposed an obligation upon the university to afford the same benefit to all classified employees who exhausted their sick leave with pay during pregnancy.

192. During this conversation, Bakewell complained to Reese about his references to maternity leave.

193. On November 17, Johnson approved Reese's recommendation to award Bakewell 50 percent of her November salary and none of her December salary. *Id.* (relevant Personnel Action request). He also effected his earlier decision to grant her extended sick leave without pay. *Id.* (same). On November 21, Reese sent Bakewell a copy the Personnel Action Request form memorializing these two actions. Id. (Letter from Reese to Bakewell of 11/21/88). Bakewell received this document on November 30.

194. On December 1, Bakewell telephoned Reese about the decision to pay her 50 percent of her November salary and none of her December salary. Reese again discussed why he had denied Bakewell extended sick leave with pay. He also agreed to provide this explanation to her in writing.

195. Bakewell asked for a copy of the memorandum that Reese had sent to Johnson regarding his recommendation to pay Bakewell 50 percent of her November salary and none of her December salary. Although she failed to say so openly, she made this request because of suspicion that SFA was discriminating against her based on sex. Reese declined her request.

196. On December 7, Bakewell wrote to Reese about their conversation six days earlier. Joint Ex. 451. In this correspondence, she stated the following:

> We also discussed your providing me with a copy of the memo which you sent to President Johnson regarding the Personnel Action Request. Since it is likely that your memo was influential in President Johnson's decision, I believe I have a right to be provided with a copy of the memo. In our phone conversation you were unsure whether you want to share that information with me. I hope you will see fit to do so.

*Id.* On December 9, Reese sent Bakewell a copy of the memorandum in which he advised Johnson to award Bakewell 50 percent of her November salary and none of her December salary. *See* Pls.' Ex. 102.

197. Bakewell wrote to Reese on December 21. In her letter, she stated the following:

> I still have not received a response to Dr. Gaylord's memo requesting that I be granted leave with pay for the last two months of 1988. Specifically, I am requesting that I receive a written statement of the decision, along with the reason(s) for that decision. You did promise to send me this information in our telephone conversations of November 16, 1988 and December 1, 1988. I also put my request for this information in writing on December 7, 1988. If, for some reason, you are unable to supply me with the information, please tell me who is in a position to do so.

Joint Ex. 450.

198. Although Bakewell failed to disclose any of them to Reese, three concerns instigated this correspondence. First, she wanted an answer from Johnson, the official who had made the ultimate decision regarding Gaylord's request to grant her extended sick leave with pay. Second, she found Reese's prior explanations somewhat vague. Finally, she wondered why Reese's memorandum to Johnson had focused on her pregnancy.

199. On January 2, 1989, Reese replied to Bakewell's letter. He stated that "there was no written response to Dr. Gaylord's memo" and disclosed that he had communicated to both Gaylord and Brophy "by telephone ... what my recommendation had been to Dr. Johnson." Pls.' Ex. 103. Because of this response's failure to offer an explanation for the rejection of Gaylord's request for Bakewell to receive extended sick leave with pay, Bakewell wrote to Johnson on January 11 for "a written statement of the decision you made on my behalf and the reason(s) for that decision." Pls.' Ex. 11.

200. Bakewell again wrote to Johnson on January 25. Defs.' Ex. 28. In this correspondence, she stated the following:

Perhaps you have not yet had the opportunity to respond to my letter of January 11, 1989 in which I requested that you provide me a written statement of the decision to deny ... [Gaylord's] request, the person who made the decision, and the reason(s) for that decision. If you are unable to comply with that original request, would you please inform me as to what my next step should be in order for me to obtain that information.

*Id.*

201. On February 1, Johnson communicated to Bakewell his role in the two pay decisions concerning her. Pls.' Ex. 104. Because she concluded that he had presented no justification for the refusal to grant Gaylord's request to award her extended sick leave with pay, Bakewell wrote to Johnson on February 24 asking for one. Joint Ex. 453. When he failed to reply, she wrote him a letter, which included the following, on March 22:

I have not yet received your written statement of your reason or reasons for denying Dr. Gaylord's request that I be granted leave with pay for November and December of 1988. Since you have not responded to my most recent letter to you dated February 24, 1989, I am requesting that you appoint two members of a committee of the University Grievance Panel....

The specific issue I would like the Grievance Panel to address is your failure to provide me with a written statement of the reason(s) why you denied Dr. Gaylord's request for me to receive pay for November and December of 1988. The specific action that I am seeking is that you comply with my request to document your reason(s) for that administrative decision.

Joint Ex. 454.

202. Although she failed to state them, Bakewell sent this correspondence for several reasons, including her continuing worry that SFA officials' focus on her pregnancy constituted sex discrimination.

203. On April 11, Johnson responded to Bakewell's most recent letter. Joint Ex. 461. In this reply, he stated the following:

The provision for a grievance panel is included in Section 5 [of SFA's Policy and Procedures for Resolving Administrative Decisions Other Than Termination and Non–Renewal of Contracts], which authorizes ... a [grievance] panel when a faculty member alleges "that University policy regarding the faculty member's conditions of employment have been violated...." Before proceeding further with your request, I would like to know which University policy, in you opinion, has been violated.

In your correspondence on this matter, you request "a written statement of reason(s)" for my decision regarding Dr. Gaylord's request. I am not aware of any policy that requires a written statement of reasons for an administrative decision by myself or any other administrator.

*Id.*

### Grievance Proceeding

204. In a May 31, 1989, letter to Johnson, Bakewell asserted that "the denial of sick leave and subsequent denial of tenure was discriminatory and an abridgement of my constitutional rights." Joint Ex. 455. Johnson's response to these allegations reported that the lack of a written explanation of the rejection of Gaylord's request to grant Bakewell extended sick leave with pay was a nongrievable issue because that circumstance violated no university policy. Joint Ex. 462.

205. Bakewell never pursued a grievance over the refusal to provide her with extended sick leave with pay.

206. Bakewell initiated a proceeding under the grievance policy concerning probationary faculty who fail to receive reappointment. She claimed the following: wrongful and discriminatory denial of tenure, retaliation and abridgment of constitutional rights.

207. On December 18, Bakewell filed charges against SFA with the United States Equal Employment Opportunity Commission (EEOC) in which she alleged sex discrimination and discharge in retaliation for objecting an unlawful employment practice—the rejection of Gaylord's request to provide her with extended sick leave with pay. *See* Joint Ex. 470 (Charge of Discrimination of 12/18/89).

208. Bakewell filed another charge with the EEOC against SFA on February 22, 1990. *Id.* (Charge of Discrimination of 2/22/90). She also filed this charge with the Texas Commission on Human Rights (TCHR). *Id.* (same). Besides repeating the claims raised in her original EEOC charge, *compare id.* (Charge of Discrimination of 12/18/89) *with id.* (Charge of Discrimination of 2/22/90), she made the following new assertion: "The University implements a policy which discriminates against women with regard to sick leave, tenure, promotion, merit pay increases and salary."[35] Joint Ex. 470 (Charge of Discrimination of 2/22/90).

209. Bakewell's filing of a charge with the EEOC and TCHR spurred Provan to urge the advisory committee of the University Grievance Panel reviewing the decision to deny Bakewell tenure to focus only on the issue of whether a violation of any constitutional guarantees underlay that determination and "to forego any adjudication regarding a pattern of discrimination against other female faculty members and other employment actions listed in ... Bakewell's charge[s]." Pls.' Ex. 26.

210. On April 24, the advisory committee entered a decision in which it found probable cause that an abridgement of Bakewell's academic freedom had occurred. Joint Ex. 467; *see also* Joint Ex. 468. After this ruling, Bakewell and SFA administrators participated in a conciliation session. That negotiation failed because school officials refused to accede to her demand for reinstatement and backpay. *See* Pls.' Ex. 27.

211. A proceeding before a hearing committee of the University Grievance Panel followed.

212. On May 22, 1991, the hearing committee reported its conclusions. Joint Ex. 469.

213. First, a majority of the committee held that an infringement on Bakewell's academic freedom had occurred below the level of the department chair. *Id.* The committee's chair offered the following explication of this determination:

In agreeing that there was an infringement of academic freedom, ... the infringement occurred below the department chair level. Dr. Bakewell, who came to the University well-qualified, experienced, and with good references, was not given sufficient freedom to teach. Dr. Barron and Dr. Eastman were very committed to the counseling program at the University as taught and administered prior to Dr. Bakewell's coming, and they had strong opinions about how the program should operate. Dr. Bakewell was not given as much freedom to operate as she should have been given. This infringement of Dr. Bakewell's freedom may not have been conscious, but it was nevertheless effective. It was felt that Dr. Bakewell did not fit into the program, but in reality she was not permitted to fit into it, and that is where the infringement occurred....

The recommendation not to tenure Dr. Bakewell was a split decision, and Dr. Gaylord's recommendation against tenure seemed heavily based on this. It is a commonly-accepted principle not to tenure when the opinion is so split, and when the faculty closest to her in the instructional program recommend against. However, faculty have been tenured here on a split decision. Below the departmental level is where the the [sic] infringement initially occurred, and it was endorsed up the administrative line.

Joint Ex. 458.

214. Second, a majority of the hearing committee discerned no retaliatory denial of tenure. Joint Ex. 469.

215. Finally, a majority of the hearing committee concluded "that there was no clear evidence of sexual discrimination." *Id.*

216. Both Provan and his successor as SFA's legal counsel, Scott Chafin, told Reese that the university was absolved of liability by the hearing committee's finding that the violation of Bakewell's academic freedom had occurred below the level of the department chair.

---

**35.** Prior to this time, Bakewell had never unequivocally disclosed such a contention as to SFA's sick leave policy. *See* Pls.' Ex. 19; Pls.' Ex. 21; *cf.* Pls.' -Ex. 23.

217. On June 3, Donald Bowen, SFA's president, notified Bakewell that he had elected against overturning the decision to deny her tenure. Joint Ex. 459. He gave the following reasons for this decision:

> The grievance committee did not make a recommendation that I reverse the earlier decision.
>
> A university administrator should reverse a department tenure decision only if there exists clear evidence that the departmental decision was arbitrary and capricious or discriminated against the individual based upon protected characteristics (race, sex, age, etc.) [sic] In this situation, the committee found that there was no sexual discrimination or retaliation. There has never been any evidence that the decision was arbitrary or capricious.
>
> The committee did find that there was evidence of infringement of academic freedom below the department chairman level. The department chairman was knowledgeable of the situation and took this knowledge into consideration in making his decision. As the committee did not find him guilty of any wrongdoing in this situation, I do not feel that I or any other university administrator should substitute our [sic] judgement [sic] for his in this case. Tenure decision [sic] are best made at the departmental level and should only be reversed elsewhere when there is clear evidence of a violation of proscribed [sic] policies and procedures. This is certainly not the case here.

*Id.*

218. On June 6, the three faculty members representing Bakewell in her grievance, Deanne Malpass, Hebe Mace and Doug McMillan, asked Bowen to place Bakewell's grievance on the agenda for the upcoming July meeting of the Board of Regents. Pls.' Ex. 30. They based their request upon the following:

> It is our understanding . . . that your final judgment is to recommend dismissal. . . . We believe that your decision is in conflict with the recommendation of the Grievance Panel and the Dr. Bakewell is now entitled to have the hearing evidence submitted to the Board of Regents and that both parties be afforded an opportunity for argument.

*Id.*

219. Bowen rejected this petition. Pls.' Ex. 31. He offered the following rationale for this denial: "You indicate that the Faculty Handbook stipulates that you have a right to take your case to the Board of Regents. This is not the case; such appearances are reserved to cases of dismissal (not tenure denial) and are subject to approval of the Board." *Id.* He also apprised them of rule regarding appearances before the board. *Id.*

220. On June 12, Malpass asked for the Board of Regents to review Bakewell's grievance. *See* Pls.' Ex. 32. The Board denied this request for the following reasons:

> [It] concluded that it has an obligation to review the hearing record, and listen to argument, only in the case of a) the dismissal of a tenured faculty member, or b) the dismissal of a probationary faculty member with an unexpired appointment extending beyond the date of proposed dismissal. Dr. Bakewell was not a tenured faculty member, nor was she dismissed prior to the end of her appointment; rather, the decision not to grant her tenure meant that her appointment expired at the normal time.
>
> It is the Board's strong position that decisions relative to the granting of tenure are within the province of the academic departments, deans, the vice president of academic affairs, and the president of the university, and it accordingly has no desire to intervene in these most important decisions affecting the university.

Pls.' Ex. 33.

221. The EEOC issued a determination regarding Bakewell's charge on September 17. Joint Ex. 470 (Determination).

222. On December 16, Bakewell filed this lawsuit. Pl.'s Original Compl. at 1.

*Conclusions of Law*

223. The court possesses jurisdiction over all of Bakewell's claims. *See* 28 U.S.C. §§ 1331, 1343; 42 U.S.C. § 2000e–5(f)(3).

### Title VII & Title IX

#### Unequal Pay

224. Bakewell maintains that SFA violated Title VII and Title IX because her sex motivated it to pay her less than male faculty members possessing either the same or lesser credentials for performance of comparable work. *See* Joint Supplement to Joint Final Pretrial Order at 2.

225. Bakewell asserts disparate treatment claims. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396, 415 n. 15 (1977).

226. The court now decides whether Bakewell proves by a preponderance of evidence that her sex motivated SFA to pay her less than male faculty members possessing either the same or lesser qualifications for performance of comparable work. *See United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714–17, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403, 408–10 (1983).

227. Bakewell raises three contentions.

228. First, Bakewell challenges SFA's hiring her as an assistant professor rather than as an associate professor. Pls.' Post Trial Br. at 51. According to her, sex explains this event because her credentials were comparable to those of males whom the university had initially classified at the rank of associate professor. *See id.*

229. A factor other than Bakewell's sex precipitated the decision to appoint her as an assistant professor. Specifically, a lack of financial resources dictated that choice. *See supra* ¶ 95. SFA, moreover, attempted to recognize her exceptional credentials by giving her three years of credit toward tenure. *See supra* ¶ 95.

230. Second, Bakewell points to the university's failure to provide her with a salary adjustment. This aspect of her claim centers on one of her former male colleagues, Gary Ford. Pls.' Post Trial Br. at 58.

231. In the spring of 1989, the Department of Psychology hired Ford as an assistant professor of clinical psychology. *See* Joint Ex. 427 (Ex. XVI (answer regarding the vacancy that Ford filled)). Ford had received his Ph.D in 1986. *See* Defs.' Ex. 47 (Gary Ford's personnel file (Vita)). Since that time, he had worked part-time four semesters as an adjunct assistant professor. *See id.* (same).

232. SFA had planned to pay the individual filling the clinical psychologist position between $22,000 and $24,000. Joint Ex. 427 (Ex. XVI (answer regarding the vacancy that Ford filled)). *But cf.* Joint Ex. 436 (Memorandum from Gaylord to Reese of 2/10/88 (asking for $26,000 to be the upper limit of the salary range)). However, Ford's salary for the 1988–89 academic year, his first at SFA, was $28,000. Defs.' Ex. 47 (relevant Personnel Action Request).

233. Bakewell earned $843 less in salary for the 1989–90 academic year than Ford, despite her greater experience. *Compare supra* ¶¶ 81–87 *with supra* ¶ 231. She charges that the SFA failed to eliminate this disparity via a salary adjustment because of her sex. Pls.' Post Trial Br. at 54, 58.

234. This contention's is untenable because she fails to establish that an opportunity existed to provide her a salary adjustment after Ford's hiring. Specifically, she ignores that a decision on whether to provide her with a salary adjustment in academic year 1989–90 most likely had occurred before Ford received an offer of employment from SFA. *Compare supra* ¶ 146 *with supra* ¶ 231. If such a circumstance indeed transpired, then the 1990–91 academic year represented the first chance for her to receive a salary adjustment following Ford's arrival. However, because the 1989–90 academic year marked the end of her service at the university, such a possibility was foreclosed. *See supra* ¶¶ 102, 164.

235. Finally, Bakewell asserts that her sex prompted SFA to deny her the 4 percent across-the-board salary increase awarded for academic year 1989–90. Pls.' Post Trial Br. at 77; *see also id.* at 34–35. She considers an earlier award of an across-the-board salary increase to a male who had received a terminal contract, David Goldstein, to support this contention. Pls.' Post Trial Br. at 77; *see also* Pls.' Ex. 35 (David

Goldstein's personnel file (relevant Personnel Action form)).

236. Contrary to Bakewell's belief, a factor other than sex reconciles these divergent events. Specifically, at some time after Goldstein had concluded his service but before Bakewell had been offered her terminal contract, SFA had decided to deny across-the-board salary increases to faculty members receiving terminal contracts. *See supra* ¶ 68.

237. After considering the evidence discussed here, as well as relevant proferrings made as to the class claims in this case, the court concludes that Bakewell fails to prove by a preponderance of evidence that her sex motivated SFA to pay her less than male faculty members possessing either the same or lesser credentials for performance of comparable work.

### *Denial of Tenure*

238. Bakewell asserts that SFA's decision to deny her tenure violated both Title VII and Title IX because her sex motivated it. Joint Supplement to Joint Final Pretrial Order at 1–2.

239. Bakewell alleges disparate treatment claims. *See Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15, 52 L.Ed.2d at 415 n. 15.

240. Bakewell maintains that she must prevail because defendants fail to offer a legitimate explanation for the rejection of her tenure application. Pls.' Post Trial at 36–37.

241. This contention originates in the burden-shifting framework announced in *McDonnell Douglas Corp. v, Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that approach, the plaintiff in a Title VII disparate treatment action first must prove a prima facie case of discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 215–16 (1981). If he or she does so, then a presumption arises that the defendant unlawfully discriminated against him or her. Id. at 254, 101 S.Ct. at 1094, 67 L.Ed.2d at 215–16. To rebut this presumption, the defendant must produce evidence that it took the action about which the plain-

tiff complaints for "a legitimate, nondiscriminatory reason." *Id.* If the defendant carries this burden of production, then "the presumption raised by the prima facie case is rebutted." *Id.* at 255, 101 S.Ct. at 1094–95, 67 L.Ed.2d at 216. "[T]he trier of fact [then] proceeds to the ultimate question: whether [the] plaintiff has proven 'that the defendant intentionally discriminated against [him]' " or her. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407, 418–19 (1993).

242. Bakewell claims that defendants' justification for the decision to deny her tenure is an illegitimate, nondiscriminatory reason. Pls.' Post Trial Br. at 37. She, specifically, charges that they may not rely upon the adverse recommendations of Barron and Eastman regarding her tenure candidacy to escape liability because those faculty members' opposition violated her right to academic freedom under the First Amendment to the United States Constitution. *See id.* 26–31; *cf. supra* ¶ 213. Because of the unavailability of this explanation, she maintains that defendants fail to rebut the presumption of discrimination arising from her prima facie case. Pls.' Post Trial Br. at 37. She contends that this circumstance mandates a judgment in her favor. *Id.*

243. Bakewell apparently perceives the terms legitimate and nondiscriminatory as mutually exclusive in the Title VII context. *See id.* at 28, 37. No basis exists for such a view. *See Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957, 967–68 (1978) ("When the prima facie case is understood in light of the opinion in *McDonnell Douglas,* it is apparent that the burden which shifts to the employer is merely that of proving that he [or she] based his [or her] employment decision on a legitimate consideration, and not an illegitimate one such as race."); 1 Rodney A. Smolla, *Federal Civil Rights Acts* § 9.03[4] (3d ed.1996) ("[t]he reason must be 'legitimate' or 'nondiscriminatory,' which means only that it is not a motive that is illegal under Title VII"); *cf. St. Mary's,* 509 U.S. at 508–10, 113 S.Ct. at 2748, 125 L.Ed.2d at 417–18 (defining a defendant's burden of production as the "introduc[tion] of evidence which, *tak-*

*en as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action").

244. Bakewell, moreover, fails to recognize that the question of whether defendants produce evidence of a legitimate, nondiscriminatory reason to rebut her prima facie case of discrimination possesses no relevance at this stage of the case. Because a full trial on the merits has occurred, the court must bypass the issues of her prima facie case and defendants' effort to rebut it, which represent the first two steps of the *McDonnell Douglas* framework, and proceed directly to the ultimate factual issue of whether defendants intentionally discriminated against her, the final phase of the *McDonnell Douglas* scheme. *See Aikens,* 460 U.S. at 714–17, 103 S.Ct. at 1481–82, 75 L.Ed.2d at 408–11; *Irby v. Sullivan,* 737 F.2d 1418, 1426 (5th Cir. 1984); *see also Vislisel v. Turnage,* 930 F.2d 9, 10 (8th Cir.1991); *Harrison v. Associates Corp. of N. Am.,* 917 F.2d 195, 198–99 (5th Cir.1990).

245. The court now considers whether Bakewell proves by a preponderance of evidence that her sex motivated SFA's refusal to grant her tenure. *See Aikens,* 460 U.S. at 714–17, 103 S.Ct. at 1481–82, 75 L.Ed.2d at 408–11.

246. Bakewell alleges that Gaylord advised against awarding her tenure because of her sex. Pls.' Post Trial Br. at 14. According to her, the Department Chair relied upon the opposition of Barron and Eastman to her candidacy to conceal this impermissible basis for his recommendation. *Id.*

247. Bakewell further contends that Brophy, Reese and Johnson all reflexively accepted Gaylord's contrived explanation. Id.

She apparently believes that their doing so permitted the transmutation of the Department Chair's surreptitious sex discrimination into SFA's final decision to deny her tenure. *See id.; cf. supra* ¶ 213.

248. Gaylord claims that his recommendation to deny Bakewell tenure arose from concern about her problematic relationship with Barron and Eastman, as well as her teaching habits. *See* Post Trial Br. of Defs. at 7, 17–18.

249. Bakewell challenges Gaylord's explanation as false. Pls.' Post Trial Brief at 7–14.

250. Although Bakewell creates some doubt about the genuineness of Gaylord's rationale, an inference still fails to arise that her sex motivated his decision not to endorse her tenure candidacy.[36] *See St. Mary's,* 509 U.S. at 519–21, 113 S.Ct. at 2754, 125 L.Ed.2d at 424–25 ("It is not enough, in other words, to *dis* believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."); *cf. Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557, 559 (7th Cir.1987) (observing that "[i]t is easy to confuse 'pretext for discrimination' with 'pretext' in the more common sense (meaning any fabricated explanation for an action)").

251. Strife within the Department of Psychology's clinical program precipitated Gaylord's stance on Bakewell's tenure application. Specifically, the persistence of the complaints that Barron and Eastman had first raised about Bakewell in April, 1988, led the Department Chair to discern an irreconcilable conflict between Bakewell and her two clinical colleagues.[37] *Compare supra* ¶ 120–27 *with supra* ¶ 140–41.

---

**36.** The following claims lack believability: Gaylord verified every matter that Barron's recommendation discussed, *see generally supra* ¶ 140; Gaylord gave serious consideration to a letter supporting Bakewell's tenure candidacy from Debra Jo Johnson, a graduate of the psychology program, and; Gaylord lacked knowledge of a potential personal bias of Anson against Bakewell. None of Bakewell's other attacks on Gaylord's veracity prove persuasive. For example, she apparently points to his comment in 1985 "that part-time employment was most suitable for 'a woman in her position,' " as evidence that his explanation lacks credibility, *supra* ¶ 90. *See* Pls.' Post Trial Br. at 38. However, that particu-

lar statement really possesses no probative value because of its remoteness as to his recommendation regarding her tenure application.

**37.** That this circumstance became apparent only when Gaylord reviewed the recommendations of the Department of Psychology's tenured faculty members in November, 1988, *see supra* ¶¶ 136, 142, explains how he could have expressed the expectation that Bakewell would "continue to be[ ] a conscientious and contributing member of ... [the psychology] department," the prior month, Pls.' Ex. 100; *see also supra* ¶ 135.

252. Concern about Bakewell's graduate course instruction also affected Gaylord. Although this dissatisfaction appeared nowhere in his recommendation, *see supra* ¶ 150, it received discussion in his evaluation of Bakewell for the 1987–88 academic year, which accompanied her tenure application, *see supra* ¶ 145, 148.

253. That sex in no way inspired Gaylord's counsel makes moot the claim that an unquestioning acceptance of his position by Brophy, Reese and Johnson enabled furtive sex discrimination to translate into the ultimate decision on Bakewell's tenure candidacy.

254. Bakewell alternatively maintains that Brophy, Reese and Johnson each advised against granting her tenure because of her sex. *Compare* Pls.' Post Trial Br. at 37–38 *with id.* at 25 and *id.* at 14.

255. Each of these administrators contends that he based his adverse recommendation on the division within the Department of Psychology over Bakewell, as well as some other factors unrelated to Bakewell's sex. Post Trial Br. of Defs. SFA, et al.`at 8, 17–18.

256. Bakewell asserts that all of these explanations "lack credibility." Pls.' Post Trial Br. at 14.

257. Bakewell's efforts to deflate the proffered reasons of Brophy, Reese and Johnson, *see id.* at 14–16, prove unsuccessful.[38]

258. Bakewell's sex in no way aroused the opposition of either Brophy, Reese or Johnson to her tenure candidacy. All of these administrators based their respective recommendations on other considerations. Although each one's particular constellation of factors was unique, all of them found the opposition of Barron and Eastman extremely influential. *See supra* ¶¶ 152–53, 157, 159–61.

259. The court concludes that Bakewell fails to prove by a preponderance of evidence that her sex motivated SFA's refusal to grant her tenure.

### Failure to Receive Extended Sick Leave With Pay

■ 260. Bakewell contends that SFA's decision to deny her extended sick leave with pay violated both Title VII and Title IX because her sex instigated it.[39] Joint Supplement to Joint Final Pretrial Order at 1.

261. Bakewell alleges disparate treatment claims. *See Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15, 52 L.Ed.2d at 415–16 n. 15.

262. The court now considers whether Bakewell proves by a preponderance of evidence that her sex precipitated SFA's refusal to award her extended sick leave with pay. *See Aikens*, 460 U.S. at 714–17, 103 S.Ct. at 1481–82, 75 L.Ed.2d at 408–10.

263. Bakewell alleges that the rejection of Gaylord's request to accord her extended sick leave with pay "was not neutral—it was expressly based upon the expense of pregnancy, not the expense of all potential temporary disabilities." Pls.' Post Trial Br. at 17.

---

**38.** Of these, perhaps the strongest is the following: "Reese's purported reasoning is . . . suspect: he claims that the dissension in the department causes [sic] him to pause. . . . [But he] knew that other faculty had been tenured despite a split vote in the department." Pls.' Post Trial Br. at 15; *see also id.* at 38 ("Defendant admitted that male faculty had been tenured at SFA even with a split vote a[sic] the department level"); *cf. id.* at 15 ("Dr. Brophy testified that the lack of consensus in the department caused him to recommend against tenure. However, Dr. Reese testified that faculty had been tenured on a split vote before at SFA." (citation omitted)). However, this argument proves unpersuasive because it rests on the erroneous assumption that each faculty member's recommendation on a tenure application carries equal weight. *See supra* ¶ 150.

**39.** Both Title VII and Title IX define sex to include pregnancy and pregnancy-related conditions. *Compare* 42 U.S.C. § 2000e(k) (Pregnancy Discrimination Act (PDA), an amendment to Title VII) ("[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions") *with Pfeiffer v. School Bd. for Marion Ctr. Area School Dist.*, 917 F.2d 779, 783–84 (3d Cir.1990) (student raising pregnancy discrimination claim under Title IX) *and Ivan v. Kent State Univ.*, 863 F.Supp. 581, 586 n. 1 (N.D.Ohio 1994) (stating that a claim of pregnancy discrimination against a university-employer arises under Title IX).

264. Defendants claim that Bakewell fails to "present evidence that Dr. Reese's articulated concerns about equity and fairness in her case were mere pretexts for discrimination." Post Trial Br. of Defs. SFA, et al. at 15.

265. SFA policy establishes no obligation to afford either pregnant or non-pregnant temporarily disabled personnel extended sick leave with pay. *See supra* ¶ 75; *cf. supra* ¶¶ 73–74. It simply affords each employee the right to receive an individualized review of a request for such a benefit. *See supra* ¶ 75; *cf.* ¶¶ 73–74.

266. University administrators recognized granting Bakewell extended sick leave with pay would rob them of this discretion as to pregnant workers who exhausted their sick leave with paid. *See supra* ¶¶ 178–79 and accompanying note; *see also supra* ¶¶ 181, 191. Specifically, they understood that such a decision would establish for those employees alone an entitlement to extended sick leave with pay. *See supra* ¶ 178–79 and accompanying note; *see also supra* ¶¶ 181, 191. Budgetary concerns prompted them to chose against effecting such a regime.[40] *Supra* ¶ 178–79.

267. The rejection of Gaylord's request for Bakewell to receive extended sick leave with pay, therefore, reflected a decision against providing certain preferential treatment to pregnant employees. That circumstance violated neither Title VII nor Title IX. *See California Fed. Sav. and Loan Ass'n v. Guerra,* 479 U.S. 272, 285–86 107 S.Ct. 683, 692, 93 L.Ed.2d 613, 626–27 (1987) ("Congress intended the PDA to provide relief for working women and to end discrimination against pregnant workers. In contrast to the thorough account of discrimination against pregnant workers, the legislative history is devoid of any discussion of preferential treatment of pregnancy, beyond acknowl-

edgements of the existence of state statutes providing for such preferential treatment." (citation omitted)); *Byrd v. Lakeshore Hosp.,* 30 F.3d 1380, 1382 n. 3 (11th Cir.1994) ("the PDA '[does] not require an employer who does not provide disability benefits of paid sick leave to other employees to provide them for pregnant workers' ").

268. The court concludes that Bakewell fails to prove by a preponderance of evidence that her sex motivated SFA's refusal to grant her extended sick leave with pay.

### Title VII Retaliatory Discharge

269. Bakewell contends that SFA "retaliated against [her] ... in violation of Title VII by denying her tenure because of her opposition to an unlawful employment practice." Joint Supplement to Joint Final Pretrial Order at 2 (citation omitted). She, specifically, claims that university administrators recommended against granting her tenure because of her protests about the rejection of Gaylord's request to provide her with extended sick leave with pay, her efforts to secure a written explanation of the refusal to afford her extended sick leave with pay and her complaints to Gaylord and Reese about references to maternity leave.

270. Title VII bars an employer from "discriminat[ing] against any ... employee[ ] ... [who] has opposed any practice made an unlawful employment practice by [that] subchapter." 42 U.S.C. § 2000e–3(a). The following standard governs disposition of claims alleging a breach of this prohibition:

[T]he employee must prove that there was a causal connection between the protected activity and the adverse employment decision. The connection required is causation-in-fact or 'but for' causation. Whether or not there were other reasons as for the employer's action, the employee will prevail only by proving that 'but for' the protected activity [he or] she would not have

---

40. That the impetus for this logic—a new legal requirement to treat faculty members and classified employees equally as to the provision of benefits—only had emerged in a short time before SFA officials received the request for Bakewell to receive extended sick leave with pay, *see supra* note 31, defeats Bakewell's effort to establish herself as similarly situated to two non-pregnant temporarily disabled employees who

previously had been granted extended sick leave with pay, *see* Pls.' Post Trial Br. at 19–20 (discussing the 1984 award of extended sick with pay to Hoyet Williams and the 1987 award of a leave of absence to William Cozart). *See Smith v. Wal–Mart Stores (No. 471),* 891 F.2d 1177, 1180 (5th Cir.1990); *see also Murray v. City of Sapulpa,* 45 F.3d 1417, 1422 (10th Cir.1995).

been subjected to the action of which [he or] she claims. If the employee does not bear that burden of persuasion, [he or] she may not prevail.

*Jack v. Texaco Research Ctr.,* 743 F.2d 1129, 1131 (5th Cir.1984).

271. The court now determines whether Bakewell proves by a preponderance of evidence that, but for her complaints about the decision not to award her extended sick leave with pay, her campaign to obtain a written explanation of the denial of Gaylord's request to award her extended sick leave with pay and her objections to the use by two school officials of the phrase maternity leave, no adverse action regarding her tenure application would have occurred.[41] *See Aikens,* 460 U.S. at 714–17, 103 S.Ct. at 1481–82, 75 L.Ed.2d at 409–11; *Irby,* 737 F.2d at 1426; *Ivy v. Meridian Coca–Cola Bottling Co.,* 641 F.Supp. 157, 168 (S.D.Miss.1986) (citing *Jack* ).

272. Bakewell maintains that Gaylord advised against granting her tenure because of her protests about the refusal to grant his request to afford her extended sick leave with pay, her crusade to acquire written reasons for the rejection of the Department Chair's request for her to receive extended sick leave with pay and her complaint about his allusions to maternity leave. *See Pls.' Post Trial Brief* at 25. According to her, Gaylord relied upon the opposition of Barron and Eastman to her candidacy to mask these impermissible reasons for his recommendation. *Id.* 14, 25.

273. Bakewell further contends that Brophy, Reese and Johnson all reflexively accepted Gaylord's contrived explanation. *Id.* at 14, 25. She apparently believes that their doing so permitted the transmutation of the Department Chair's surreptitious sex discrimination into SFA's final decision to deny her tenure. *See id.* at 14, 25; *cf. supra* ¶ 213.

274. Gaylord claims that his recommendation to deny Bakewell tenure arose from concern about her difficult relationship with

Barron and Eastman and her teaching habits. See Post Trial Br. of Defs. at 7, 17–18.

275. Bakewell challenges Gaylord's explanation as false. Pls.' Post Trial Br. at 7–14, 31–32.

276. Although Bakewell creates some skepticism about the genuineness of Gaylord's rationale, an inference still fails to arise that the Department Chair would have supported her tenure candidacy but for either her criticisms about the refusal to provide her with extended sick leave with pay, her persistent requests for a written explanation of the decision to deny her extended sick leave with pay, or her protest about his his references to maternity leave. *See supra* ¶¶ 251–52 and accompanying notes.

277. Because of this circumstance, the claim that an unquestioning acceptance of Gaylord's position by Brophy, Reese and Johnson enabled surreptitious retaliation based on one or more of these matters to translate into the ultimate decision on Bakewell's tenure application is moot. *See supra* ¶ 253.

278. Bakewell alternatively maintains that her objections to the refusal to afford her extended sick leave with pay, her efforts to obtain a written explanation of the rejection of Gaylord's request to grant her extended sick leave with pay and her complaints to Reese about the refusal to afford her extended sick leave with pay and her objection to Reese's references to maternity leave triggered the respective recommendations of Reese and Johnson to deny her tenure. *See* Pls.' Post Trial Br. at 14, 25.

279. Both Reese and Johnson assert that division within the Department of Psychology concerning Bakewell's tenure application and some other factors unrelated to Bakewell's various communications regarding the refusal to grant her extended sick leave with pay prompted his opposition. Post Trial Br. of Defs. SFA, et al. at 8, 17–18.

280. Bakewell challenges these responses as unbelievable. *See* Pls.' Post Trial Br. at 14, 31–32.

---

**41.** Bakewell maintains that no need arises to reach this issue because defendants fail to present a legitimate, nondiscriminatory reason for the tenure decision. Pls.' Post Trial Br. at 23, 26. This argument possesses no merit. *See supra* ¶¶ 240–43.

281. Bakewell's efforts to refute the proffered reasons of Reese and Johnson are unsuccessful. *See supra* ¶ 257 and accompanying note.

282. Bakewell's communications regarding the rejection of Gaylord's request to award her extended sick leave with pay in no way influenced either Reese or Johnson to advise against granting her tenure.[42] *See supra* ¶ 258.

283. The court concludes that Bakewell fails to prove by a preponderance of evidence "[t]hat [s]he [w]as [d]enied [t]enure [b]ecause [s]he [o]pposed [a]n [u]nlawful [e]mployment [p]ractice," Pls.' Post Trial Br. at 23.

### First Amendment

284. Bakewell claims that SFA violated the First Amendment to the United States Constitution when university administrators opposed her tenure candidacy because of her protests about the refusal to provide her with extended sick leave with pay, her efforts to secure a written explanation of the denial of Gaylord's request to provide her with extended sick leave with pay and her complaints to Gaylord and Reese about references to maternity leave. See Joint Supplement to Joint Final Pretrial Order at 2.

█ 285. The First Amendment protects speech by government employees regarding matters of public concern. *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). To prove a violation of this guarantee, the plaintiff initially must establish that his or her speech addressed a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). He or she, then, must demonstrate that his or her interest as a citizen in making his or her comments outweighed the governmental employer's interest as an employer in promoting efficiency. *Id.* Finally, he or she must show that his or her speech motivated an employment decision adverse to him or her. Mount *Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 286–87, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

█ 286. The plaintiff must prove that he or she spoke "predominantly 'as a citizen'" to satisfy this tripartite standard's first prong. *Dodds v. Childers*, 933 F.2d 271, 274 (5th Cir.1991); *see also Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360, 1362 (5th Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). "This focus on the hat worn by the employee when speaking rather upon the 'importance' of the issue reflects the reality that at some level of generality almost all speech of state employees is of public concern." *Gillum v. City of Kerrville*, 3 F.3d 117, 121 (5th Cir.1993), *cert. denied*, 510 U.S. 1072, 114 S.Ct. 881, 127 L.Ed.2d 76 (1994); *see also Terrell*, 792 F.2d at 1362.

█ 287. Bakewell fails to meet this initial criterion because she spoke as an employee, not as a citizen, in her communications with SFA officials about the refusal to award her extended sick leave with pay.

288. First, her statements focused solely on her adverse fate that she had suffered. *Supra* ¶ 173–76, 185–87, 190–92, 194–202. She, indeed, never openly expressed any concern about SFA's sick leave policy as to persons other than herself until after her tenure candidacy had failed. *Supra* ¶ 208 and accompanying note. *Cf. Dodds*, 933 F.2d at 274 ("Retrospective embellishment cannot transform personal grievances into matters of public concern.").

289. Second, Bakewell conveyed her displeasure with the decision to deny her extended sick leave with pay, her desire for a written explanation of the refusal to provide her extended sick leave with pay and references to maternity leave in private communications with SFA officials. *See supra* ¶¶ 173–76, 185–87, 190–92, 194–202. She failed "to address her complaints to anyone outside of the [university], nor did those complaints occur against a background of ongoing public debate about the administration of the [university]." *Dodds*, 933 F.2d at 274;

---

42. Bakewell makes no argument that any of her various communications regarding her failure to receive extended sick leave with pay influenced Brophy's recommendation to deny her tenure.

*Compare* Pls.' Post Trial Br. at 25 with id. at 1–4. However, even if she did so, that contention would fail. *See supra* ¶ 258.

*see also Thompson v. City of Starkville, Miss.,* 901 F.2d 456, 466 (5th Cir.1990).

290. Finally, "context alone cannot transform [Bakewell's] inherently self-interested [statements] into [those] that implicate[ ] public issues." *Caine v. Hardy,* 943 F.2d 1406, 1416 (5th Cir.1991) (en banc), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). Although discrimination against females in the administration of a state university's extended sick leave policy certainly represents a matter about which the citizenry cares, "in the context in which it [was] presented in this case ..., it was a purely personal and private matter." *Ayoub v. Texas A & M Univ.,* 927 F.2d 834, 837 (5th Cir.), *cert. denied,* 502 U.S. 817, 112 S.Ct. 72, 116 L.Ed.2d 47 (1991).

291. The court concludes that Bakewell fails to prove by a preponderance of evidence that SFA violated the her First Amendment free speech right as a public employee.

### HEBE MACE

#### Findings of Fact

292. Plaintiff, Hebe Mace, received a Ph.D in English from the University of Arkansas in 1978. Joint Ex. 498. SFA's Department of English and Philosophy hired her that year as a post-doctoral intern, a temporary, non-tenure-track position. Defs.' Ex. 7 (Hebe Mace's personnel file (excerpts) (Letter from Franklin to Mace of 6/14/78)).

293. Mace continued to serve as a post-doctoral intern during the 1979–80 academic year. *Id.* (Reappointment Notification of 4/27/79).

294. After the internship ended, Mace first worked four-and-a-half months as a lecturer in SFA's Department of English and Philosophy. *Id.* (Letter from Franklin to Mace of 7/25/80). She then entered concurrent contracts with the university to serve four-and-a-half months as a lecturer in the Department of Administrative Services and as a lecturer in the Department of English and Philosophy. *Id.* (Letter from Franklin

to Mace of 1/20/81). None of this service was creditable toward tenure at SFA. *Id.* (Letter from Franklin to Mace of 7/25/80) (Letter from Franklin to Mace of 1/20/81).

295. SFA's Department of English and Philosophy hired Mace as an assistant professor in 1981. See Joint Ex. 498.

296. Mace received tenure, as well as promotion to associate professor, in 1987. Defs.' Ex. 7 (Reappointment Notification of 8/26/87).

297. On February 7, 1992, Mace became a party plaintiff to this lawsuit. Pls.' First Am. Compl. at 1.

#### Conclusions of Law

298. The court possesses jurisdiction over Mace's claims. *See* 28 U.S.C. § 1331; 42 U.S.C. § 2000e–5(f)(3).

299. Mace asserts that SFA violated Title VII and Title IX because her sex motivated it to pay her less than male faculty members possessing either the same or lesser credentials for performance of comparable work. *See* Joint Supplement to Joint Final Pretrial Order at 2.

300. Mace alleges disparate treatment claims. *See Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15, 52 L.Ed.2d at 415 n. 15.

301. The court now determines whether Mace proves by a preponderance of evidence that her sex motivated SFA to pay her less than male faculty members possessing either the same or lesser credentials for performance of equal work. *See Aikens,* 460 U.S. at 714–17, 103 S.Ct. at 1481–82, 75 L.Ed.2d at 409–11.

302. Mace raises three contentions.

303. First, Mace challenges SFA's claim that Ignacio Munoz, a member of the Department of Modern Languages between academic year 1965–66 and December, 1992,[43] Defs.' Ex. 75 (comparison 28), always earned a higher salary than her because of greater scholarly productivity. *See* Pls.' Post Trial Br. at 80–81. She, specifically, ob-

---

**43.** Munoz retired from SFA following the fall semester of the 1992–93 academic year. *See* Defs.' Ex. 75 (comparison 28). He had received

a salary of $16,709 for his final term at SFA. *Id.* (same).

serves that his failure to publish any scholarly works between 1970 and 1988 refutes this justification. *See id.*

304. Although Mace's attack is fairly persuasive, see Joint Ex. 143 (Ignacio Munoz's personnel file (Curriculum Vita)),[44] an inference that her sex explains why she invariably received less compensation than Munoz fails to arise because another factor accounts for this situation: Munoz's earlier employment by SFA. *See St. Mary's,* 509 U.S. at 519–21, 113 S.Ct. at 2754, 125 L.Ed.2d at 424–25 Specifically, he began to work as an assistant professor at the university in 1968, Joint Ex. 141 (Curriculum Vita), while she started to serve in this capacity in 1981, *supra* ¶ 295. That situation interacted with across-the-board salary increases to enable him to continue to receive more pay than her. For example, for the 1988–89 academic year, his salary exceed hers by $5843. *See* Defs.' Ex. 75 (comparison 28). The following year, she was awarded a $1000 salary adjustment and two levels of merit, which totalled $900, *see supra* ¶ 51, while he secured no such awards. *See* Defs.' Ex. 75 (comparison 28). However, rather than decline by $1900, the disparity between the salaries of the two faculty members only decreased by $1666, *see* Defs.' Ex. 75 (comparison 28). The 4 percent across-the-board salary increase that they each received that academic year precipitated that situation. *See id.* (same); *supra* ¶¶ 62, 69.

■ 305. Second, Mace objects to SFA hiring her as post-doctoral intern. Pls.' Post Trial Br. at 50–51. This contention focuses on one of her former colleagues in the Department of English and Philosophy, Leon (Lee) Schultz. *Id.*

306. Mace and Schultz both joined SFA's Department English and Philosophy in 1978. *Compare* Joint Ex. 176 (Lee Schultz's personnel file (Letter from Franklin to Schultz of 5/5/78)) *with supra* ¶ 292. Only he, however, entered as an assistant professor. *Compare* Joint Ex. 176 (Letter from Franklin to Schultz of 5/5/78) *with supra* ¶ 292. Based upon her conviction that she possessed credentials comparable to those of Schultz in 1978, Mace alleges that SFA hired her as a post-doctoral intern rather than as an assistant professor because of her sex. Pls.'Post Trial Br. at 51.

307. Mace overlooks a distinction between Schultz and her in 1978. At that time, he had worked for five years as assistant professor at another university, see Joint Ex. 176 (Faculty Application Form), while she possessed no such experience,[45] see Joint Ex. 498; *cf.* Joint Ex. 499B (Academic Appointment Titles (description of lecturer intern rank)).

308. SFA, moreover, assigned an important and unique responsibility to Schultz: creation of a developmental English lab. Unlike Mace, Schultz had been involved in such an enterprise in his prior job. *See* Joint Ex. 476 (Letter from Schultz to Franklin of 5/11/78). That circumstance further justified hiring him at a rank higher than her.[46]

■ 309. Finally, Mace contests SFA's claim that Schultz's longer service explains why he always earned more than her. Pls.' Post Trial Br. at 78 (citing Joint Ex. 435 (salary comparisons regarding Mace)). She considers this contention specious because

---

44. The copy of Munoz's curriculum vita found in joint exhibit 143 was prepared in 1988. It, therefore, offers no insight as to his scholarly activity between that year and 1992, when he retired.

45. Mace may consider her service for five years as a graduate assistant and for two years as an instructor prior to 1978 to equate with Schultz's five years of work as an assistant professor. *See* Pls.' Post–Trial Brief at 51. But she provides no substantiation for such an opinion. For example, nothing establishes that any of her pre-SFA jobs in academia were full-time, like the assistant professorship that Schultz had held. See Joint Ex. 176 (Recommendation for Appointment); *cf.*

Joint Ex. 499B (Academic Appointment Titles (description of graduate assistant rank)).

46. Mace fails to provide the following, critical piece of information: whether she had applied or had been entitled to receive consideration for the position that Schultz filled. *See* Defs.' Ex. 7; *cf.* Joint Ex. 176 (Letter from Schultz to Franklin of 5/11/78 (indicating some of the criteria for the assistant professor position that he accepted)); Joint Ex. 499B (Personnel Services (Faculty Search)). That omission raises the possibility that she only sought the post-doctoral internship. If that situation occurred, then her argument collapses because she, alone, determined the character of her appointment in 1978.

they both began to work at the university in 1978. *Id.* 78, 81.

310. Mace's challenge rests on a conception of longevity different from that to which SFA adheres. Specifically, unlike her, the university defines faculty member longevity as time served in a tenure or tenure-track position. Schultz had worked for SFA three years longer than Mace under this definition.[47] *Compare supra* ¶ 292 *with supra* ¶ 296 *and supra* ¶ 306. Therefore, his greater service, not his sex, truly represents a reason why he always earned more than her.[48]

311. After considering the evidence discussed here, as well as relevant proferrings made as to the class claims in this case, the court concludes that Mace fails to prove by a preponderance of evidence that her sex motivated SFA to pay her less than male faculty members possessing either the same or lesser credentials for performance of comparable work.

## PLAINTIFF CLASS

### Findings of Fact

312. On September 1, 1993, United States District Judge William Wayne Justice certified this case as a class action as to "plaintiffs' allegations of wage discrimination against female faculty members by [SFA] ..., in violation of the 1964 Civil Rights Act." Order, entered Sept. 1, 1993, at 1. He defined the plaintiff class[49] as the following:

[A]ll female faculty members, who have been employed by [SFA] ... at any time after April 29, 1989, all female faculty members now employed by SFA; and all female faculty members who may be employed in the future by SFA (to the extent ascertainable); which groups of women may have been, may now be, or may in the future be, discriminated on the basis of sex by defendants' practices with respect to pay, in violation of Title VII.

*Id.*

313. Judge Justice subsequently permitted plaintiffs to add a Title IX claim alleging wage discrimination. *See, e.g.,* Pls.' Fifth Am. Compl. at 9–10.

314. The amended joint final pre-trial order redefined the plaintiff class as "female tenure and tenure track faculty (assistant, associate and full professors)" who have been employed by SFA at any time since April 29, 1989.[50] Joint Supplement to Am. Joint Pre–Trial Order at 1; *see also* Am. Joint Final Pre–Trial Order at 2, 21, 11, 13, 15.

47. Mace attempts to debunk this explanation by pointing to SFA's crediting of another member of the Department of English and Philosophy, Dale Hearell, "with years of longevity for time when he had not been on tenure track, indeed had not even been a full time teacher or had a Ph.D." Pls.' Post Trial Br. at 78 (citing Joint Ex. 439 (1990–91 budget summary)). She apparently believes that Hearell's circumstance exposes the effort to differentiate the time that she served in non-tenure-track positions from that which Schultz worked in a tenure-track position as unjustifiable. *See id.* However, the decision regarding Hearell occurred because of a failure by university officials to realize that he had reported an earlier position held at SFA as that of instructor, a tenure-track position, even though he had actually worked as a lecturer, a non-tenure-track position. *See* Defs.' Ex 87 (Dale Hearell's personnel file (excerpts) (Faculty Application Form)). Such an unconscious oversight in no way undermines the credibility of SFA's claim that it measures longevity based on time served in a tenure or tenure-track position.

48. Mace discredits SFA's additional claim that Schultz received a greater salary for academic years 1988–89, 1989–90 and 1991–92 because he held a higher academic rank. *See* Pls.' Post Trial Br. at 78 (citing Joint Ex. 435 (salary comparisons regarding Mace)). *Compare* Joint Ex. 176 (Reappointment Notification of 8/26/87) *with supra* ¶ 296. *Compare* Joint Ex. 176 (Reappointment Notification of 4/25/88) *with* Defs.' Ex. 7 (Reappointment Notification of 4/25/88). *Compare* Joint Ex. 176 (Reappointment Notification of 7/25/89) *with* Defs.' Ex. 7 (Reappointment Notification of 7/25/89). *Compare* Joint Ex. 176 (Reappointment Notification of 11/1/91) *with* Defs.' Ex. 7 (Reappointment Notification of 11/1/91). This achievement, however, fails to rouse concern about the authenticity of greater service in a tenure-track position as an explanation for Schultz receiving a higher salary than Mace for those particular academic years.

49. In the ensuing discussion, the court often refers to the plaintiff class simply as the plaintiffs or the class.

50. A list of current class members appears as exhibit A to the amended joint final pre-trial order. *See* Am. Joint Final Pre–Trial Order ex. A.

### Conclusions of Law

315. The court possesses jurisdiction over plaintiffs' claims. *See* 28 U.S.C. § 1331; 42 U.S.C. § 2000e–5(f)(3).

### Maintenance of Class Action

316. The class satisfies Federal Rule of Civil Procedure 23(a)'s prerequisites for class certification and falls within the category of actions that Federal Rule of Civil Procedure 23(b)(2) describes. *Compare* Am. Joint Final Pre–Trial Order at 11–12 *with Johnson v. Shreveport Garment Co.*, 422 F.Supp. 526, 534–35 (W.D.La.1976) ("*Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir.1973), mandates that the trial court determine the propriety of class action status at the preliminary certification stage and after trial on the merits"), *aff'd*, 577 F.2d 1132 (5th Cir.1978).

317. The class meets Rule 23(a)'s first criterion, numerosity, because it includes unknown future tenure and tenure-track female faculty members at SFA, *see supra* ¶ 312. *See Phillips v. Joint Legislative Comm.*, 637 F.2d 1014, 1022 (5th Cir.1981).

318. Rule 23(a)'s second requirement, commonality, is satisfied. Evidence regarding differences in compensation between certain tenure and tenure-track female faculty members and one or more of their male colleagues, *see, e.g.*, Pls.' Exs. 59–62; Defs.' Ex. 75, perhaps best discloses the question common to all class members: does SFA discriminate against female tenure and tenure-track faculty members in the setting of salaries? *See Jenkins v. Raymark Indus.*, 782 F.2d 468, 472 (5th Cir.1986).

319. Rule 23(a)'s third prerequisite, typicality, prevails. Evidence presented to support the individual salary discrimination claims of the two class representatives, Bakewell and Mace, converges with that offered to establish the class claims, *see, e.g.*, Pls.' Ex. 94. *See Hebert v. Monsanto Co.*, 576 F.2d 77, 80 (5th Cir.1978).

320. Rule 23(a)'s final condition, adequate protection of class interests by class representatives, is met. Bakewell and Mace have "vigorously prosecute[d] the interests of the class through qualified counsel." *Johnson*, 422 F.Supp. at 534–35. Their attorneys' thorough investigation of numerous salary decisions concerning former and current female tenure and tenure-rack faculty members at SFA epitomizes that effort. *See* Pls.' Exs. 61–94.

321. The class also comes within the scope of Federal Rule of Civil Procedure 23(b), which requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R.Civ.P. 23(b). First, the class offers evidence professing to show how defendants took actions generally applicable to its members. *See, e.g.,*, Pls.' Exs. 57A–57H. Second, the class desires injunctive and declaratory relief. *See* Am. Joint Final Pre–Trial Order at 11.

### Title VII & Title IX

322. Plaintiffs contend that SFA violates Title VII and Title IX by consistently paying female faculty members less than male faculty members performing comparable work because of their sex. Joint Supplement to Joint Final Pretrial Order at 2. They, specifically, assert "that women are systematically discriminated against in compensation, primarily due to disparate treatment in initial pay, promotion, merit pay and salary adjustments." Pls. Post Trial Br. at 40. They proffer a number of regression analyses, as well as other evidence, to support their claims.

323. Plaintiffs assert pattern or practice claims of discrimination. *See Teamsters*, 431 U.S. at 336 n. 16, 97 S.Ct. at 1855 n. 16, 52 L.Ed.2d at 416 n. 16. To prevail, they must "establish by a preponderance of the evidence that [sex] discrimination was the [university's] standard operating procedure—the regular rather than the unusual practice[—]" as to the determination of salaries for tenure and tenure-track faculty members employed by SFA after April 29, 1989. *Id.* This burden requires them to show "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Id.*

324. Defendants dispute plaintiffs' charges. *See, e.g.*, Am. Joint Final Pre–Trial

Order at 3. Like plaintiffs, they present both statistical and nonstatistical evidence.

325. The court now considers whether plaintiffs show by a preponderance of evidence a *pattern or practice of sex discrimination* in the compensation of female tenure and tenure-track faculty members employed by SFA after April 29, 1989. *See Bazemore v. Friday,* 478 U.S. 385, 398, 106 S.Ct. 3000, 3007–8, 92 L.Ed.2d 315, 328–30(1986) (Brennan, J., concurring) (citing *Aikens* ).

### Regression Analyses

#### Population vs. Sample

326. Plaintiffs constantly assert that the database underlying a particular set of regression outputs includes the population relevant to this case, all tenure and tenure-track faculty members at SFA. *See* Pls.' Post Trial Br. at 42–43, 46–47, 60–61. That contention lacks basis because both sides in this case agreed to exclude administrative faculty members from their respective databases.[51] *Compare* Joint Supplement to Am. Joint Pre–Trial Order at 1 and Letter from Rodriguez to the Court, Oct. 19, 1993 (writing to request exclusion from the class); Notice from Ashley to the Court, filed Oct. 2, 1993 (same); Letter from Russell to the Court, Oct. 31, 1993 (same); Letter from Doyle–Anderson to the Court, Nov. 1, 1993 (same) *with* Pls.' Ex. 129 *and* Defs.' Ex. 82. *Compare* Joint Ex. 170 (Beverlyanne Robinson's personnel file) *with* Am. Joint Final Pre–Trial Order ex. A (listing Beverlyanne Robinson as a member of plaintiff class).

327. However, despite this circumstance, the regression analyses presented in this action still offer the promise of substantial insight about the forces underlying faculty member salary levels at SFA because most members of the class are part of the group of individuals that comprises each side's database. *See* Pls.' Ex. 129; Defs.' Ex. 88.

### Signs of Gender Coefficients

328. Plaintiffs repeatedly focus on the consistency of the sign (positive or negative) for each gender coefficient appearing in a particular set of regression outputs,[52] *see* Pls.' Exs. 57C1 & 57D1; Defs.' Ex. 79. They identify the significance of this circumstance as the following:

> [Gray] observ[ed] that each year for ten years, women earned less than men in both [defendants'] ... and [plaintiffs'] ... analyses.... [She] affirmed that such a result was not likely to occur by chance, rather, one would expect a distribution of five years with women earning more and five years with women earning less. Just as with ten coin tosses, one would not expect all ten tosses to result in heads, but instead five tosses of heads and five tosses of tails.

*Id.* at 46 (citations omitted). In other words, because the probability of the gender coefficient possessing the same sign year after year due to chance is extremely low, plaintiffs contend that the consistency of the sign of the gender coefficients in each particular set of regression analyses over time demonstrates the presence of "systemic, class-wide pay discrimination."[53] *Id.* at 43.

---

**51.** This arrangement reflected a common belief that administrators are unrepresentative of SFA faculty members. *See generally supra* ¶¶ 30–31. For example, department chairs receive a stipend for their administrative work. *See, e.g.,* Joint Ex. 174 (Patricia Russell's personnel file (Reappointment Notification of 7/2/5/89)).

**52.** In plaintiffs' regression model, a negative sign indicates how much less females earn, on average, if all other independent variables are held constant. *See* Pls.' Ex. 57C1; Pls.' Ex. 57D1. In defendants' regression analyses, a positive sign signifies how much more compensation males receive than females, on average, if all other independent variables are controlled. Defs.' Ex. 61a–61g.

**53.** Plaintiffs raise this contention as to their regression analyses using their data, Pls.' Post Trial Br. at 42–43, 46, their regression analyses using defendants' data, *id.,* and defendants' regression analyses, *id.* at 60–61. They, however, fail to do so in response to defendants' claim that errors in plaintiffs' database inflate both the gender coefficients and t statistics that plaintiffs' regression analyses yield, Post Trial Br. of Defs. SFA, et al. at 42–47. *See* Pls.' Post Trial Br. at 67–74; *see also id.* at 60–61. This omission seems puzzling because the gender coefficients resulting from that enterprise all possess the same sign, *see* Defs.' Ex. 81. The court, therefore, presumes that plaintiffs also wish to assert their argument as to that particular set of gender coefficients.

329. This argument only proves availing if observations of successive academic years, which represent the focus of both sides' regression analyses, are independent. *See Presseisen v. Swarthmore College*, 442 F.Supp. 593, 617–18 (E.D.Pa.1977), *aff'd*, 582 F.2d 1275 (3d Cir.1978).

330. Because that condition fails to arise in this case, plaintiffs' contention regarding the constancy of the sign of the gender coefficients in various regression results possesses no persuasiveness. *See* Pls.' Ex. 129; Defs.' Ex. 88.

### Plaintiffs' Regression Analyses

331. Plaintiffs present a regression model that designates faculty member salary level as the dependent variable and department, rank, education, date of hire by SFA, date of degree and gender as the independent variables. *See* Pls.' Ex. 57C1; Pls' Ex. 57D1.

332. Plaintiffs' database encompasses many of the non-administrative professors, associate professors and assistant professors from all eight of the schools/colleges in SFA's Division of Academic Affairs for academic years 1986–87, 1987–88, 1989–90 and 1990–91. *See* Pls.' Ex. 128 (Lawson Dep. at 51); Defs.' Ex. 85. *See generally* Joint Ex. 500; Pls.' Ex. 129. Similarly, it includes some of the non-administrative professors, associate professors and assistant professors from three of the schools/colleges—Business Administration, Education and Liberal Arts—for academic years 1991–92, 1992–93 and 1993–94. See Pls.' Ex. 128 (Lawson Dep. at 51); Defs.' Ex. 85. *See generally* Joint Ex. 500; Pls.' Ex. 129.

333. Of plaintiffs' various regression results, the most favorable to their case are those produced when rank is excluded from their regression model as an independent variable. See Pls.' Ex. 57H. Specifically, the gender coefficients and t statistics generated substantially exceed those arising when the model includes rank as an independent variable. *Compare* Pls.' Ex. 57C1 *and* Pls.' Ex. 57D1 *with* Pls.' Ex. 57H. According to plaintiffs, this situation establishes that the outputs of model including rank as an independent variable "underestimate the effect gender has on salaries at SFA." Pls.' Post Trial Br. at 48. Such an explication supports their assertion that sexual animus motivates determinations concerning initial faculty member salary, as well as those relating to promotion to a higher academic rank, at SFA. *Id.*

334. Contrary to what plaintiffs may believe, *see id.*, this contrast between regression outputs, alone, offers insufficient insight as to whether or not females suffer adverse decisions regarding academic rank at SFA because of their sex. *See Ottaviani v. State Univ. of N.Y. at New Paltz*, 679 F.Supp. 288, 300, 306 (S.D.N.Y.1988) ("Gray's comparisons of the regression which included rank variables with the one that did not proved only that rank had a statistically significant influence on salary, and that men and women were unequally distributed across the ranks. It did not show that the ranks were unfairly distributed or discriminatory."), *aff'd*, 875 F.2d 365, 374–75 (2d Cir.1989), *cert. denied*, 493 U.S. 1021, 110 S.Ct. 721, 107 L.Ed.2d 740 (1990). *See generally Chang v. University of R.I.*, 606 F.Supp. 1161, 1215–16 (D.R.I.1985).

335. When they run their regression model (including rank) using their data, plaintiffs find a gender coefficient achieving a 0.05 level of significance (i.e., one falling more than 1.96 standard deviations from the expected value in a two-tailed test) for academic years 1988–89 (t = − 2.07), 1989–90 (t = − 2.54), 1990–91 (t = − 2.68) and 1991–92 (t = − 2.37). Pls.' Exs. 57C1; Pls.' Ex. 57D1. They also determine that the time series average for the annual gender coefficients reaches the 0.05 level of significance for both the period covering academic years 1986–87 to 1990–91 (t = − 4.69) and the period covering academic years 1991–92 to 1993–94 (t = − 3.31). Pls.' Ex. 57F. *See generally* Pls.' Ex. 128 (Lawson Dep. at 35–38).

336. Plaintiffs claim that these outputs support their claims. *See* Pls.' Post Trial Br. at 47. However, their reliance on rank as a proxy variable for faculty member performance or productivity advises prudence in interpreting their regression results.

If a proxy appears to reflect the consequences of productivity—e.g., academic rank—then it may make sense to assume

that equal productivity should lead to equal amounts of the proxy. Thus, using rank as a proxy for performance would be expected to produce underadjustment bias such that the sex coefficient would measure sex-performance linkage in addition to sex-salary linkage. In this situation, statistical significance of the sex coefficient need not represent discrimination.

Ramona L. Paetzold & Steven L. Willborn, *The Statistics of Discrimination: Using Statistical Evidence in Discrimination Cases* 6–27 (1994).

337. Plaintiffs' regression analyses using their data, furthermore, may suffer from some multicollinearity as to the experience, rank, degree and gender variables. This circumstance also counsels caution in construing these studies. *See id.* at 6–29.

338. Although neither of these concerns eviscerates plaintiffs' regression results derived from plaintiffs' data of probative value, both of them raise serious questions about those outputs' reliability.

339. Plaintiffs also run their regression model (including rank) using defendants' data exclusive of instructors and part-time faculty members. *See* Pls.' Ex. 57G.

340. The results of this effort are less impressive than those yielded when plaintiffs run their model using their database. *Compare* Pls.' Ex. 57C1 *and* Pls.' Ex. 57D1 *with* Pls.' Ex. 57G. Moreover, the caveat regarding the use of rank as a proxy variable possesses equal force as to them. *See supra* ¶ 336.

341. Plaintiffs regression outputs derived from defendants' data, therefore, offer little additional support for their claims.

### Defendants' Regression Analyses

342. Defendants introduce backward elimination and stepwise regression analyses to rebut plaintiffs' regression results. *See* Defs.' Exs. 61a–61g. *See generally* Defs.' Ex. 55.

343. Defendants rely upon a data set that encompasses all eight of the schools/colleges in the Division of Academic Affairs for academic years 1984–85 through 1993–94. *See* Defs.' Ex. 88

344. Much of defendants' statistical evidence suffers from a fatal defect. Specifically, their backward elimination solutions for all faculty ranks for academic years 1984–85, 1985–86, 1986–87, 1987–88, 1988–89, 1989–90, 1990–91, 1991–92 and 1993–94, Defs.' Ex. 61a, their backward elimination solutions for all faculty with publications for academic years 1984–85, 1985–86, 1986–87 and 1987–88, Defs.' Ex. 61c, their stepwise solutions for all faculty ranks for academic years 1986–87, 1987–88, 1988–89 and 1990–91, Defs.' Ex. 61d, and their stepwise solutions for academic years 1984–85, 1985–86 and 1987–88 of all SFA faculty that include publications as an independent variable, Defs.' Ex. 61g, possess no probative value because each of them derives from data that includes persons outside of the plaintiff class, instructors. *Compare* Defs.' Ex. 88 *with supra* ¶ 314.

345. This problem fails to arise as to defendants' backward elimination solutions for their data exclusive of instructors for academic years 1984–85, 1985–86, 1986–87, 1987–88, 1989–90 and 1990–91, Defs.' Ex. 61b, their stepwise solutions for all assistant and associate professors for academic years 1986–87, 1987–88, 1988–89, 1990–91, 1991–92 and 1993–94, Defs.' Ex. 61e, or their stepwide solutions for all professors for academic years 1986–87, 1987–88, 1988–89, 1989–90 and 1990–91, Defs.' Ex. 61f.

346. Defendants determine backward elimination solutions for their data exclusive of instructors for academic years 1984–85, 1985–86, 1986–87, 1987–88, 1989–90 and 1990–91. Defs.' Ex. 61b. In these, they used the linear form of salary as the dependent variable. *See* Defs.' Ex. 61b.

347. With the exception of the 1985–86 academic year, none of these backward elimination solutions include gender as an independent variable substantially contributing to faculty member salary level at SFA. *See id.*

348. Defendants also find the stepwise solutions for assistant and associate professors for academic years 1986–87, 1987–88, 1988–89, 1990–91, 1991–92 and 1993–94, Defs.' Ex. 61e, as well as for professors for academic years 1986–87, 1987–88, 1988–89,

1989–90 and 1990–91, Defs.' Ex. 61f. In all of these analyses, defendants use the logarithmic form of salary as the dependant variable. *Id.*

349. Defendants perform this exercise because their salary data seems to disclose a gap between salaries that professors receive and those that assistant and associate professors earn. *See* Defs.' Ex. 77.

350. None of the stepwide solutions either for assistant and associate professors or for professors includes gender as an independent variable substantially contributing to the explanation of faculty salary level at SFA. *See* Defs.' Ex. 61e; Defs.' Ex. 61f.

351. Defendants claim that these results demonstrate the absence of gender as a factor in the setting of salaries at SFA. This argument, however, loses force in light of the following: the order in which possible independent variables are added or removed from the hypothesized regression model can affect the content of a backward elimination solution, as well as that of a stepwide solution.

352. Defendants' surviving backward elimination and stepwise solutions may suffer from another shortcoming. One of the two independent variables for faculty member experience that defendants use defines that concept as time since receipt of Master's degree. *See, e.g.,* Defs.' Ex. 61a. When defendants fail to find the date on which a particular faculty member was awarded his or her Master's degree, they presume that the conferral occurred four years prior to the earning of a Ph.D. They, consequently, measure experience for the individual as number of years since the granting of a Ph.D plus four.

353. This technique raises the possibility that measurement distorts defendants' solutions. *See generally Reference Manual on Scientific Evidence* 437–38 (1994) ("if one or more independent variables are measured with error, the corresponding parameter estimates are likely to be biased, typically toward 0").

354. Although neither of these concerns robs defendants' backward elimination solutions for all SFA faculty exclusive of instructors or their stepwise solutions for assistant and associate professors and for professors of all probative value, they create serious questions about those outputs' reliability.

### Plaintiffs' Additional Evidence Regarding SFA's Salary System

355. Plaintiffs offer evidence relating to three components of SFA's salary system to show that SFA has engaged in practices resulting in "[s]ex-[b]ased [p]ay [d]isparities." Pls.' Post Trial Br. at 50.

### Initial Rank

356. Plaintiffs maintain "that SFA has engaged in a pattern or practice of initially classifying women at lower ranks than male faculty and initially appointing women to non-tenure track positions while males receive tenure track appointments, thereby causing women to earn less than men." *Id.* Besides their comparison of the results produced when they include rank in their regression model and those yielded when they exclude that independent variable from it, *see supra* ¶ 333, plaintiffs also offer the respective experiences of Mace, Pamela Lee and Bakewell to establish this circumstance's prevalence.

357. First, plaintiffs cite SFA's appointment of Mace as a post-doctoral intern and Schultz as an assistant professor in 1978. Pls.' Post Trial Br. at 50–51. They allege that the university refused to appoint her to the rank of assistant professor because of her sex. *See id.*

358. Contrary to plaintiffs' belief, a factor other than sex explains why SFA assigned Schultz to a higher initial academic rank than Mace. *See supra* ¶¶ 307–8 and accompanying notes.

359. Second, plaintiffs point to the different ranks to which SFA initially assigned Pamela Lee and Paul Vance. Pls.' Post Trial Br. at 51.

360. In 1992, the university hired both Lee and Vance to work in the Department of Music. *See* Joint Ex. 113 (Pamela Lee's personnel file (Letter from Reese to Lee of

6/8/92)).[54] It, however, designated her as an instructor and him as an assistant professor. Id. Plaintiffs declare that only Lee's sex can explain these divergent decisions because both Vance and she "had obtained [a] ... doctorate[ ] that summer." Pls.' Post Trial Br. at 51.

361. A factor other than sex underlies the disparate treatment of Lee and Vance. Specifically, although the Department of Music's chair considered seeking a promotion for Lee to assistant professor when she completed her Ph.D before starting her service at SFA, he elected not to initiate such an effort because of concern that she would fail to secure a salary increase if she received elevation to that rank. See Joint Ex. 435 (Memorandum from Anderson to Ashley of 4/7/94, at 2).

362. Finally, plaintiffs refer to SFA's refusal to hire Bakewell as an associate professor. Pls.' Post Trial Br. at 51. They assert that her sex precipitated that denial. Id.

363. Contrary plaintiffs' contention, a factor other than sex prompted the initial appointment of Bakewell as an assistant professor. See supra ¶ 95.

364. None of these situations supports plaintiffs' charge that SFA systematically places new female faculty members in lower academic ranks than new male faculty members.

### *Promotion*

365. Plaintiffs allege that, during most of the 1970s, SFA routinely required females to serve longer in lower academic ranks than males prior to promotion. Pls.' Post Trial Br. at 52. According to them, "[s]ince promotion to a higher rank results in a salary increase, the slower promotion of women exacerbated the initial disparities in pay on the basis of sex." Id. at 52–53.

366. Along with their comparison of the results generated when their regression model includes rank and of those produced

when it excludes that independent variable, see supra ¶ 333, plaintiffs point to several other circumstances to support this contention.

367. First, plaintiffs suggest that SFA's reliance on "unwritten, subjective" promotion criteria prior to 1978 enabled the practice of elevating female faculty members to higher academic ranks more slowly than their male colleagues to occur. Pls.' Post Trial Br. at 52; see id. at 54.

368. Plaintiffs seem to insinuate no standards governed promotion decisions before 1978.[55] See Pls.' Post Trial Br. at 52. But the promotion application used during that period disclosed relevant considerations. See supra ¶ 34. That document, moreover, included two sections pertaining to years of college teaching experience and years of service at SFA. E.g., Joint Ex. 130 (Recommendation for Promotion of 2/23/73). Although neither of these indicated a maximum or minimum time limit on service in a lower rank prior to promotion, they each provided a sense of the university's expectation regarding that matter. See id.; cf. supra ¶ 35.

369. Second, plaintiffs cite the findings of a 1975 report, *The Status of Women at Stephen F. Austin State University,* Pls.' Ex. 96, as establishing that the school constantly elevated females less rapidly than males to higher academic ranks prior to 1978. Pls.' Post Trial Br. at 53–54. That study includes statistics disclosing that, during the 1960s and early 1970s, females received a disproportionately small number of the promotions granted and that males, on average, served less time than females before being elevated to a higher rank. See Pls.' Ex. 96 (*The Status of Women at Stephen F. Austin University* 16–18 (1975) [hereinafter *Report* ] ). Plaintiffs apparently posit that these circumstances resulted in the following: the mean salary of female instructors falling below that of their male counterparts; the mean salary of female assistant professors falling below

---

54. The evidence includes no personnel file for Vance. See Joint Ex. List; Pls.' Am. List of Exs.; Defs.' First Am. Ex. List.

55. Plaintiffs apparently refrain from making the legally untenable assertion that SFA's reliance upon a subjective promotion system was discrim-

inatory per se, see Anderson v. Douglas & Lomason Co., 26 F.3d 1277, 1292 (5th Cir.1994), cert. denied, 513 U.S. 1149, 115 S.Ct. 1099, 130 L.Ed.2d 1066 (1995). See Pls.' Post Trial Br. at 52.

that of their male counterparts and; the mean salary of female associate professors falling below that of their male counterparts.[56] *See* Pls.' Post Trial Br. at 53 (citing Pls.' Ex. 96).

370. These figures afford no meaningful support for plaintiffs' allegation regarding SFA's pre–1978 faculty promotion because of their rudimentary character. *See Pouncy v. Prudential Ins. Co. of America,* 668 F.2d 795, 802–3 (5th Cir.1982); *Wilkins v. University of Houston,* 654 F.2d 388, 410 (5th Cir. Unit A Aug.1981) ("the day is long past ... when we proceed with any confidence toward broad conclusions from crude and incomplete statistics"), *vacated on other grounds,* 459 U.S. 809, 103 S.Ct. 34, 74 L.Ed.2d 47 (1982).

371. Finally, plaintiffs cite a trend in the salaries of Sylvia McGrath and Deanne Malpass, two females who joined the Department of History in the late 1960s, *see* Joint Ex. 123 (Deanne Malpass' personnel file (Letter from Malpass to Lewis of 7/1/69)); Joint Ex. 130 (Letter from Lewis to McGrath of 4/8/68).

> [B]oth Dr. Malpass and Dr. McGrath ... had excellent productivity and teaching records, yet the two women progressed more slowly than their male colleagues during the 1970s. Under the more objective criteria instituted in [1978] ..., however, both women began catching up and during recent years even surpassed some of their male colleagues.

Pls.' Post Trial Br. at 54 (citing Pls.' Ex. 94q). Plaintiffs' construe this occurrence to demonstrate that sexual animus corrupted pre–1978 promotion decisions. *See id.*

372. Contrary to plaintiffs' view, this coincidence of events, alone, fails to sustain a conclusion that McGrath and Malpass did not rise through the academic hierarchy as quickly as some of their male counterparts during the 1970s because of their sex. *See Wilkins,* 654 F.2d at 410 ("That everyone who has eaten bread has died may tell us something, but not very much."); *cf. Manual, supra,* at 421 ("A correlation between two variables does not imply that one event causes the second one to occur.").

373. Plaintiffs' non-regression evidence that, during most of the 1970s, SFA regularly held females faculty members in lower academic ranks longer than males prior to promotion is uncompelling.

### Salary Adjustments

374. Plaintiffs contend that "SFA fails to award salary adjustments in a gender-neutral manner." Pls.' Post Trial Br. at 54–55. They declare that the following substantiates this allegation: incumbent male faculty members generally receive salary adjustments to increase their pay above that of new female faculty members presently earning more than them, but incumbent female faculty members generally fail to receive salary adjustments to increase their pay above that of new male faculty members earning more than them. *See id.* at 55–57. They seek to establish this condition's existence through specific examples. *See id.*

375. Plaintiffs present eight cases in which SFA awarded a salary adjustment to a male faculty member whose compensation fell below that of a female colleague who had recently commenced her service. *See id.* They, however, overstate the magnitude of salary adjustment provided to the incumbent male faculty member in each of these instances.[57] *Compare, e.g.,* Pls.' Post Trial Br. at 55–57 (making no mention of the effect of across-the-board salary increases on faculty member salaries) *with supra* ¶ 69. For example, plaintiffs portray the entire $1450 rise in the salary of Robert Kinsell, a member of the Department of Art, between academic years 1989–90 and 1991–92 as a salary ad-

---

56. During that time, females holding professorships, on average, received greater compensation than males at that rank. *See* Pls.' Ex. 96 (*Report supra,* at 8). The *Report* identified longer service at SFA as explaining this disparity. *Id.* (same).

57. An absence of adequate evidence regarding one or more of the male incumbent faculty members involved in the examples concerning the Department of Communications, the Department of Mathematics and Statistics, and the Department of English and Philosophy forecloses reliable determination of the size of the relevant salary adjustment as to each one. *See* Joint Ex. List (including no information on the employment history of McCall, Feistel or Stapleton); Pls.' Am. List of Exs. (same); Defs.' First Am. Ex. List (same).

justment. *See* Pls.' Post Trial Br. at 55. Only $1000 of this increase, however, represents a salary adjustment. *See* Joint Ex. 108 (Robert Kinsell's personnel file (Reappointment Notifications of 7/25/89, 4/25/90 & 11/1/91)); Defs.' Ex. 75 (comparison 20).

376. Moreover, in this particular case, plaintiffs intimate that the failure of Susan Baker, who began working in the Department of Art a year after Kinsell, *see* Defs.' Ex. 75 (comparison 20), to receive a salary increase in the 1991–92 academic year reflects part of a scheme to boost Kinsell's pay over hers. *See* Pls.' Post Trial Br. at 55. That suggestion ignores that no across-the-board salary increase was given that academic year, *see supra* ¶ 63, and that Baker was ineligible to receive either merit or a promotion at that time, *see supra* ¶¶ 35, 49. *See* Defs.' Ex. 75 (comparison 20).

377. Plaintiffs also allude to four circumstances in which SFA afforded no salary adjustment to a female faculty member whose compensation fell below that of a male colleague who had recently begun his service. Pls.' Post Trial Br. at 57–58.

378. First, plaintiffs report the following: [I]n the Political Science Department, a male ... was hired for the 1990–91 [academic] year at $26,500, $600 more than the female incumbent, [Gayle] Berardi. Yet, Berardi's salary was not adjusted until 1992–93, when the equity fund was established and she received an increase of $3409. Dr. Berardi also earned less than two new male hires in 1990–91.

*Id.* at 57.

379. Plaintiffs overlook that Berardi's contract for the 1990–91 academic year included a $500 salary adjustment. Joint Ex. 435 (Memorandum from Gregory to Ashley of 4/6/94, at 2, 3); Defs.' Ex. 75 (comparison 24). They also forget that a moratorium on salary adjustments prevented her from securing another award the following academic year. Joint Ex. 435 (Memorandum from Gregory to Ashley of 4/6/94, at 2, 3).

380. Second, plaintiffs point to the SFA's failure to grant a salary adjustment to Ann Doyle–Anderson, a member of the Department of Modern Languages, for three years following the employment of Pedro Escamilla, who possessed lesser credentials than her. Pls.' Post Trial Br. at 57.

381. A factor other than sex accounts for this situation. Specifically, budgetary constraints prevented the university from providing Doyle–Anderson with a salary adjustment during the three years subsequent to Escamilla' hiring. *See* Joint Ex. 6 (Letter from Reese to Moses of 9/2/87).

382. Third, plaintiffs cite the absence of a salary adjustment award to Bakewell after the hiring of Ford at a salary above hers. Pls.' Post Trial Br. at 58.

383. Plaintiffs, however, fail to establish that Bakewell ever possessed an opportunity to receive a salary adjustment to push her pay over that of Ford. *See supra* ¶ 234.

384. Finally, plaintiffs report the failure of either of two female faculty members in the Department of Kinesiology and Health Sciences to receive a salary adjustments to boost their salaries over that of a male newcomer, George K. Taylor. Pls.' Post Trial Br. at 58.

385. Nothing discloses the reason for this circumstance.

386. Contrary to plaintiffs' belief, these eight episodes collectively fail to show that "SFA fails to award salary adjustments in a gender-neutral manner," Pls.' Post Trial Br. at 54.

### *Plaintiffs' Attacks on Defendants' Nondiscriminatory Reasons*

387. Defendants provide one or more nondiscriminatory reasons to explain a number of cases in which a female faculty member earned less than one or more of her male colleagues. *See, e.g.,* Joint Ex. 435 (salary comparisons regarding Mace and Malpass). *Compare* Pls.' Exs. 59–92 *with* Defs.' Ex. 75. Plaintiffs challenge the following of these justifications: longer service at SFA; more teaching experience; higher academic rank; holding a named position; earlier receipt of degree; greater scholarly productivity and; market forces. *See* Pls.' Post Trial Br. at 76–1.

### Longer Service at SFA

388. Defendants frequently point to a male faculty member's longer service at SFA as a reason why he earned a higher salary than one of his female colleagues. *See, e.g.,* Defs.' Ex. 75 (comparisons 6, 16, 27–29 & 32).

389. Plaintiffs claim that two of the instances in which defendants invoke this explanation prove unpersuasive. *See* Pls.' Post Trial Br. at 78–79, 80. They consider· this circumstance to discredit it. *See id.* at 81.

390. First, plaintiffs argue that length of service fails to justify Schultz always receiving a salary higher than that which Mace earned. *Id.* at 78.

391. Plaintiffs' challenge is unpersuasive. *See supra* ¶¶ 309–10.

392. Second, plaintiffs observe that less service at SFA offers a basis neither for why Malpass received less compensation than Jere Jackson, who began his service in the Department of History one year after her, *compare* Joint Ex. 123 (Letter from Malpass to Lewis of 7/1/69) *with* Joint Ex. 435 (salary comparisons regarding Malpass), for academic years 1986–87 and 1987–88 nor for why she earned less than John Dahmus, who started to work in the Department of History one year after her, *compare* Joint Ex. 123 (Letter from Malpass to Lewis of 7/1/69) *with* Joint Ex. 435 (salary comparisons regarding Malpass), for academic years 1986–87, 1987–88 and 1988–89. Pls.' Post Trial Br. at 78–79 (citing Pls.' Ex. 94q).

393. Plaintiffs' arguments regarding Malpass prove convincing. *Compare* Joint Ex. 435 (salary comparisons regarding Malpass) *with* Pls.' Ex. 94q. This success, however, fails to expose longer service at SFA as reason never worthy of belief because, in many other cases, that circumstance actually provides an explanation for why a male faculty member earned more than a female colleague. *See, e.g.,* Defs.' Ex. 75 (comparisons 6, 16, 27–29 & 32); *supra* ¶ 309–11.

### More Teaching Experience

394. Defendants often point to more teaching experience as a justification for a male faculty member receiving greater compensation than a female colleague.[58] *See, e.g.,* Defs.' Ex. 75 (comparisons 1, 3, 11–14, 16–17, 29 & 31–33).

395. Plaintiffs present the following scenario to rebut this rationale:

> The University's justification for the difference in the salary between Dr. Pamela Roberson and Dr. Joseph McWilliams does not adequately account for the difference in salary, as Dr. Roberson's own department chair recognized. (PX 124, letter of November 11, 1991 "It is my judgment that there magnitude of the difference [in salary] cannot be justified by one having three more years total experience than the other.").

Pls.' Post Trial Br. at 80.

396. Plaintiffs ignore the context of this particular situation. They, specifically, not only overlook how the economic market effected McWilliams' earning a higher salary than Roberson, *see* Pls.' Ex. 124, but show no appreciation for how across-the-board salary increases exacerbated this disparity, *compare* Joint Ex. 133 (Joseph McWilliams' personnel file (Reappointment Notifications of 5/2/86, 8/26/87, 4/25/88, 7/25/89, 4/25/90 & 11/1/91)) *and* Joint Ex. 169 (Pamela Roberson's personnel file (Reappointment Notifications of 5/2/86, 4/25/87, 7/25/89, 4/25/90 & 11/1/91)) *and* Pls.' Ex. 94u *with supra* ¶¶ 59–64, 69. Consequently, their effort to rebut greater teaching experience as a nondiscriminatory reason for differences in the salaries of male and female faculty members at SFA fails.

### Higher Academic Rank

397. Defendants periodically cite a higher academic rank as a rationale for why a male faculty member received greater compensation than a female colleague. *See, e.g.,* Joint Ex. 435 (salary comparisons regarding Malpass) (salary comparisons regarding Mace)

---

**58.** SFA credits both teaching at universities and in public schools. *See, e.g.,* Defs.' Ex. 75 (comparison 17).

(salary comparisons regarding Ernetta Fox for academic year 1990–91).

398. Plaintiffs argue that several cases in which defendants invoke this reason are specious. *See* Pls.' Post Trial Br. at 78, 79. They consider this circumstance to discredit it. *See id.* at 81.

399. Plaintiffs maintain that higher academic rank fails to explain why Schultz received a higher salary than Mace in academic years 1988–89, 1989–90 and 1991–92. Pls.' Post Trial Br. at 78. To support this contention, they observe that "both held the same rank of associate professor during each of those years ... [and] were promoted the same year, 1987." *Id.*

400. Plaintiffs' argument is unassailable. *See supra* note 48.

401. Plaintiffs also note that, contrary to defendants' contention, *see* Joint Ex. 435 (salary comparison regarding Malpass), higher rank affords no justification for why Malpass earned less than Jackson in academic years 1986–87 and 1987–88 or for why she received less compensation than Dahmus in academic years 1986–87, 1987–88 and 1988–89 because all three of these faculty members held the rank of associate professor until 1990. Pls.' Post Trial Br. at 79.

402. Plaintiffs' contention proves convincing. *See* Pls.' Ex. 94q.

403. Plaintiffs refute higher academic rank as an explanation for why a female faculty member earned less than one or more of her male colleagues in three instances. However, because higher academic rank in many other cases actually provides a reason for why a male faculty member earned more than a female colleague, *see, e.g.,* Defs.' Ex. 75 (comparisons 3, 7, 23 & 27). this accomplishment fails to establish that reason as always unworthy of belief.

### Holding a Named Position

404. Defendants sometimes contend that a male faculty member received a higher salary than a female colleague because only he held a named position. *See, e.g.,* Joint Ex.

435 (salary comparisons regarding Pamela Lee).

405. Plaintiffs allege that one of the cases in which defendants rely upon this explanation is unpersuasive. *See* Pls.' Post Trial Br. at 80. They argue that this circumstance discredits it. *See id.* at 81.

406. Plaintiffs assert the following:

Defendant's [sic] explanation for the difference in the salary between Dr. [Pamela] Lee and Mr. [Kevin] Sedatole in 1992–93, that Sedatole held a "named position" ... fails to adequately account for the disparity. Dr. Lee's uncontradicted testimony demonstrates that she, too, would have held a "named position" but her department chair claim the dean did not care for titles.

*Id.* at 80 (citing Joint Ex. 435 (salary comparison regarding Pamela Lee)).

407. Plaintiffs' argument rests on the assumption that holding a job title is synonymous with occupying a named position. Nothing supports such a supposition.[59]

408. Plaintiffs' attempt to discredit named position as a nondiscriminatory reason for disparities between the compensation of male and female faculty members at SFA proves unavailing.

### Earlier Receipt of Degree

409. Defendants often justified a male faculty member earning a higher salary than a female colleague on the ground that he received his advanced degree first. *See, e.g.,* Defs.' Ex. 75 (comparisons 4, 6, 11, 16–17, 23, 27 & 31).

410. Plaintiffs allege that one of the cases in which defendants present this explanation is unconvincing. *See* Pls.' Post Trial Br. at 80. They contend that this circumstance discredits it. *See id.* at 81.

411. Plaintiffs assert the following: "The University justified the difference [in initial salary between Vance and Lee] with the claim that ... Vance had completed his terminal degree. However, ... Lee and ... Vance completed their terminal degrees in the same year, three months apart. Both

---

59. Indeed, in her trial testimony, Lee just ex-    pressed a belief that these two concepts coincide.

... had their doctorates when they began teaching at SFA." Pls.' Post Trial Br. at 79–80 (citing Joint Ex. 435 (salary comparisons regarding Pamela Lee)).

412. Plaintiffs' argument proves persuasive because Vance earned more than Lee even though they both had received a $1000 pay increase for earning of a Ph.D prior to the commencement of service at SFA. *See* Joint Ex. 435 (salary comparisons regarding Pamela Lee).

413. Although earlier receipt of highest degree offers no justification for the male's larger salary this particular case, that circumstance fails to establish this explanation as always unbelievable because, in many other cases, it actually provides a reason for why a male faculty member received more compensation than a female colleague. *See, e.g.,* Defs.' Ex. 75 (comparisons 4, 6, 11, 16–17, 23, 27 & 31).

### Greater Scholarly Productivity

414. Defendants often offer greater scholarly productivity as a rationale for why a male faculty member received a higher salary than a female colleague. *See, e.g., id.* (comparisons 7, 8, 11, 16, 20, 22–23, 25 & 28).

415. Plaintiffs allege that one of the instances in which defendants rely upon this justification proves unconvincing. See Pls.' Post Trial Br. at 80–81. They argue that this situation discredits it. *See id.* at 81.

416. Plaintiffs note that greater productivity fails to justify Munoz consistently receiving a larger salary than Mace. *Id.*

417. Plaintiffs' argument is fairly persuasive. *See supra* ¶ 304. This success, however, fails to expose greater scholarly productivity as an explanation always unworthy of belief. Indeed, in many other cases, this circumstance really affords a reason for why a male faculty member earned more than a female colleague. *See, e.g.,* Defs.' Ex. 75 (comparisons 7, 8, 11, 16, 20, 22, 23 & 25).

### Market Forces

418. Defendants frequently contend that market forces explain why a male faculty member earned a higher salary than a more senior female colleague. *See, e.g., id.* (comparisons 2, 4–6, 8–9, 14–15, 19, 21, 24 & 33).

419. Besides their regression analyses, *see supra* ¶¶ 335, 339–40, plaintiffs offer the following situation to bare this nondiscriminatory reason as a sham:

> SFA claims that, in 1989–90, Dr. Ford was hired at a higher salary than Dr. Bakewell earned because of market forces....
>
> . . .
>
> According to Defendant's [sic] market forces argument, Dr. [Kandy] Stahl, a female with similar qualifications to those of Dr. Ford when she began teaching at SFA [in 1992–93], should have earned a salary higher than Dr. Ford's.... However, Dr. Stahl earned $1,040 less then [sic] Dr. Ford in 1992–93.

Pls.' Post Trial Br. at 76–77.

420. Plaintiffs' contention overlooks a significant fact: Stahl's starting salary represented the maximum that SFA had budgeted the position that she filled. *Compare* Joint Ex. 427 (Ex. XVI (answer regarding the vacancy that Stahl filled)) *with* Joint Ex. 436 (Defs.' Second Supplemental Resp. to Pls.' Req. for Produc. of Docs. on Class Issues No. 5 (relevant Personnel Action Request)). This situation was the first instance since some time before 1986 that the compensation actually paid to a new clinical psychologist did not exceed the salary range for that job.[60] *See supra* ¶ 232. *Compare supra* ¶ 92 *with supra* ¶ 96. Stahl's circumstance, therefore, disclosed that SFA finally had increased its pay range for new clinical psychologists to a competitive level.

421. Plaintiffs' effort via nonstatistical evidence to discredit market forces as a nondiscriminatory explanation for why some male

---

**60.** This event, indeed, marked the first occasion since some point before 1986 that any individual had entered the Department of Psychology at a salary within the contemplated range. *Compare* Joint Ex. 427 (Ex. XVI (answer regarding the vacancy that George Yancey filled)) *with* Joint Ex. 436 (relevant Personnel Action Request). *Compare* Joint Ex. 427 (Ex. XVI (answer regarding the vacancy that Mark Ludorf filled)) *with* Joint Ex. 436 (relevant Personnel Action Request).

faculty members received higher salaries than their female colleagues fails.

### Discussion

422. Review of all of the evidence presented regarding plaintiffs' claims fails to create a conviction that more likely than not "discrimination in pay based on sex is the usual practice at SFA," Pls.' Post Trial Br. at 81.

423. Plaintiffs' regression results and accompanying interpretations support for their claims. *See supra* ¶¶ 335, 339–40. Likewise, some of defendants' backward elimination and stepwide solutions bolster their position. *See supra* ¶¶ 346–50.

424. Neither side, however, establishes conclusively through their regression analyses whether or not sexual animus underlies faculty salary decisions at SFA. *See supra* ¶¶ 338, 341, 354. For this reason, consideration of other evidence must occur. *See, e.g., Lewis v. N.L.R.B.,* 750 F.2d 1266, 1272 (5th Cir.1985) ("In probing discriminatory intent, a trial court may examine the history of the employer's practices, anecdotal evidence of class members, and the degree of opportunity to treat employees unfairly in the [decisionmaking] process."). *See generally Teamsters,* 431 U.S. at 340, 97 S.Ct. at 1856–57, 52 L.Ed.2d at 418 ("We caution only that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be refuted. In short, their usefulness depends on all of the surrounding facts and circumstances.").

425. This other evidence fails to strengthen plaintiffs' interpretations of their regression analyses' results.

426. First, the evidence regarding specific decisions about a female faculty member's initial rank and the evidence relating to university promotion practices prior to 1978 offers no support for plaintiffs' claim that the difference between the size of the gender coefficients and t statistics yielded when their regression model includes rank and those generated when their regression model excludes rank shows sexual animus infecting determinations concerning academic rank at

SFA. *Compare supra* ¶¶ 333–35 *with supra* ¶¶ 356–73.

427. Second, that greater scholarly productivity often affords an explanation for why a particular female faculty member received a lower salary than one or more of her male colleagues heightens concern that the gender coefficients and t statistics associated with plaintiffs' regression analyses may overstate the influence of sex on faculty member salary levels at SFA. *Compare supra* ¶ 336 and *supra* ¶ 340 *with supra* ¶ 417.

428. Third, the frequency with which longer service at SFA, more teaching experience, higher academic rank and earlier receipt of degree arise as reasons why one or more male faculty members earned more than a certain female colleague seems to confirm that plaintiffs' regression analyses using their data suffer from some multicollinearity. *Compare supra* ¶ 337 *with supra* ¶¶ 390–91, 393, 403.

429. Finally, the other evidence in this case provides little independent indication of a pattern or practice of discrimination against female faculty members in the setting of salaries at SFA.

430. Plaintiffs occasionally create skepticism about one or more of the nondiscriminatory rationales that defendants present to justify why a particular female faculty member having was paid less than one or more of her male colleagues. *See supra* ¶¶ 392–93, 399, 400, 401–2, 411–12, 416–17. However, even if all of these instances were precipitated by sexual animus, they disclose no pattern or practice of discrimination emerges. Rather, they simply establish that "isolated or 'accidental' or sporadic discriminatory acts" occurred. *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855, 52 L.Ed.2d at 416.

431. The paucity of anecdotal evidence of discrimination severely diminishes plaintiffs' contention that a pattern or practice of salary discrimination against female faculty members prevails at SFA. *See Wilkins,* 654 F.2d at 402 n. 18 ("where the employer is engaged in widespread discrimination against a class of employees there should be many individual instances of such discrimination); *Eastland v. Freeman,* 528 F.Supp. 862, 881

(N.D.Ala.1981) ("If plaintiffs have a class claim, surely they can find one good example of discriminatory mistreatment of a black employee." (citing *Wilkins* )), *aff'd sub nom. Eastland v. Tennessee Valley Auth.*, 704 F.2d 613 (11th Cir.1983), *cert. denied,* 465 U.S. 1066, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984); *see also Griffin v. Board of Regents of Regency Univ.*, 795 F.2d 1281, 1292 (7th Cir.1986) ("examples of individual discrimination are not always required, but we think that the lack of proof reinforces the doubt arising from questions about the validity of the statistical evidence").

432. "All of the surrounding facts and circumstances," *Teamsters,* 431 U.S. at 340, 97 S.Ct. at 1857, 52 L.Ed.2d at 418 at offer little confirmation for plaintiffs' assertion that their regression analyses "demonstrate[ ] a pattern or practice of discrimination by SFA," Pls.' Post Trial Br. at 39.

433. Perhaps because of this situation, plaintiffs harp upon the consistency of the sign for each gender coefficient appearing in a particular set of regression results. *See supra* ¶ 328. The failure of this argument to conform with a critical methodological assumption, however, forecloses it from bolstering their claims. *See supra* ¶¶ 329–30.

434. The court, therefore, concludes that plaintiffs fail to prove by a preponderance of evidence a pattern or practice of sex discrimination in the compensation of female tenure and tenure-track faculty members employed by SFA after April 29, 1989.

### CONCLUSION

435. The court renders a judgment on the merits in favor of defendants as to Bakewell's claim that SFA discriminated against her in violation of Title VII and Title IX by denying her equal pay because of her sex.

436. The court renders a judgment on the merits in favor of defendants as to Bakewell's claim that SFA discriminated against her in violation of Title VII and Title IX by denying her tenure because of her sex.

437. The court renders a judgment on the merits in favor of defendants as to Bakewell's claim that SFA discriminated against her because of sex in violation of Title VII and Title IX by denying her extended sick leave with pay.

438. The court renders a judgment on the merits in favor of defendants as to Bakewell's claim that SFA retaliated against her in violation of Title VII.

439. The court renders a judgment on the merits in favor of defendants as to Bakewell's claim that SFA violated her free speech right as a public employee under the First Amendment to the United States Constitution.

440. The court renders a judgment on the merits in favor of defendants as to Mace's claim that SFA discriminated against her in violation of Title VII and Title IX by denying her equal pay because of her sex.

441. The court renders a judgment in favor of defendants as to the plaintiff class' claim that SFA engages in a pattern and practice of paying female tenure and tenure track faculty members employed since April 29, 1989, less than male colleagues for comparable work because of their sex.